Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff[1] sues for breach of his contract of March 1Y,1950, with the Bureau of Reclamation of the Department of the Interior. This contract, No. 12r-18946, provided for construction of the Fort Sumner. Diversion Dam across the Pecos River at a point near Fort Sumner, New Mexico. Plaintiff contends that the termination of his right to proceed with the whole of the contract work, exercised by the Contracting Officer by letter dated January 30, 1951, under Article 9 of the contract, was wrongful because beyond the terms of that provision.
Article 9 provides, in pertinent part, as follows:
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, * * * the G-overnment may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise * * *.
Also of importance here are paragraphs 38 and 3Y of Specifications No. 2906. They establish dates for the release of irrigation water, interim deadlines (March 1, 1951, for the paragraph 38 releases, and April 5, 1951, for the paragraph 3Y releases) occurring before the deadline for completion of the entire construction contract (July 23, *335 1951). These critical provisions read, in pertinent part, as follows:
[Paragraph 38]
In addition to other requirements of these specifications for passing natural or required flow of water past the diversion dam, the contractor shall arrange his operations to permit the passage of irrigation releases from Alamogordo Dam to the Carlsbad Pro j ect. The quantity of water passed during each release will be approximately 20,000 acre-feet and the rate of flow during such releases will be between 1,000 and 2,000 cubic feet per second. Not more than one release will be made during any one month and not more than 3 releases will be made during any one irrigation season, March through September, inclusive. The contracting officer will notify the contractor of such releases approximately 7 days in advance of the beginning of such releases. The contractor shall not interrupt or interfere with the natural or required flow of water past the dam for irrigation or other purposes without the approval of the contracting officer * * *.
[Paragraph 31]
The construction to be performed under these specifications will replace portions of the existing canal and structures of the Fort Sumner Canal, and these portions of the construction work will have to be performed at times when water is not flowing in the existing canal. The existing canal will be carrying water from approximately April 5 to October 31, and the contractor will not be permitted to interrupt the flow of the canal during that period. It is required that a continuous flow of 100 cubic feet per second of water be supplied through the existing canal during the irrigation season. The contractor shall make necessary provisions for supplying this quantity of water by whatever method he elects. If at any time immediately prior to or during the irrigation season the contracting officer determines that the contractor’s methods are inadequate to guarantee continued delivery of 100 cubic feet per second in the canal, the Government reserves the right to enter upon the site of the work and to take such minimum action as may be necessary to guarantee the required flow of water.
The events preceding the termination, briefly summarized, are these: This construction contract was awarded March 17, *336 1950, on a bid submitted in tbe names of plaintiff and one Nathan A. Moore as joint venturers. (The agreement between plaintiff and Moore provided that plaintiff was to bear full financial responsibility and exercise full authority for the administration of the contract. The association of Mr. Moore’s name with the contract was secured as a result of plaintiff’s concern that because of his own lack of experience in this particular type of heavy construction work, the requisite bonding could not otherwise be obtained.)
Plaintiff received notice to proceed on April 29, 1950. He made good progress from late May, when he began contract work, until September 30, when his discharge of the first of his three successive job superintendents occasioned a shutdown of 3 weeks. During this shutdown, plaintiff received the first of the several communications from the Bureau of Reclamation which he was to receive before the termination, expressing concern (in the light of the irrigation deadlines) over the progress of the job.
The tenure of plaintiff’s second superintendent (from mid-October to late December) saw occasional delays in the receipt of needed materials and equipment parts, which resulted from financing difficulties begun to be experienced by plaintiff. An additional delay of approximately 1 week resulted from defendant’s failure to provide the proper cement, and plaintiff was required to perform substantial extra work beyond the contract specifications; but for neither of these factors did plaintiff request an extension of time.
Plaintiff’s difficulties increased in severity during the month of January, and his shortage of operating capital resulted in delays. This lack of adequate funds was the principal reason for the resignation on J anuary 21, 1951, of the plaintiff’s third job superintendent. With this event, work on the job was shut down while plaintiff sought both a competent superintendent and additional capital with which to resume operations.
The day preceding the termination of J anuary 30,1951, a conference was held between plaintiff and representatives of the Bureau of Reclamation, at which time plaintiff informed the Bureau personnel of the fact that he had succeeded both *337 in securing an experienced superintendent and in arranging for a loan of $50,000 to. finance construction. Notwithstanding these assurances, the Bureau representatives (unconvinced that plaintiff would be able to meet the oncoming irrigation deadlines, the first of which was but a month away) insisted that plaintiff relinquish sole control over the project, which plaintiff refused to do. It was this refusal which precipitated the termination by defendant.
Following termination, plaintiff’s surety took over the work and completed the job as a whole on June 19,1951, more than a month before the final deadline. However, work necessary for the first of the irrigation flows — that provided under paragraph 38 and scheduled as possible anytime on or after March 1 — was not completed until March 19.
The resolution of two issues is necessary to a decision of this case:
(1) Was the defendant’s termination of the entire contract authorized by the terms of Article 9, under which it was exercised ?
(2) If the plaintiff may recover for breach of contract because the termination of the entire contract was beyond the authority of Article 9, is he nonetheless precluded from recovery for the termination of his right to proceed on that portion of the contract work necessary to meet the irrigation deadlines described in paragraphs 37 and 38 of Specifications 2906?
We hold that Article 9 did not authorize termination of plaintiff’s right to proceed with the contract work as a whole. That provision permits termination only for failure to prosecute work “with such diligence as will insure its completion within the time specified in Article 1.” Article 1 specifies that the total work “shall be completed as provided in paragraph 22 of Specifications No. 2906,” which paragraph in turn provides that the contractor “shall complete all of the work within four hundred and fifty (450) calendar days from the date of receipt of such notice” to proceed. Accordingly, termination of the entire contract here was a proper exercise of the authority conferred on the contracting officer by Article 9 if, and only if, that officer had reasonably con- *338 eluded that plaintiff was failing to prosecute the work with such diligence to insure completion by July 23, 1951 (which was 450 days following receipt of notice to proceed).
Neither is it clear that the Contracting Officer here concluded that plaintiff was unable to complete his work by the final date, nor would such a conclusion, if clearly made, have been supported by the facts before him.
It was not the conclusion that plaintiff was unlikely to meet the over-all completion date, but rather concern over the approaching irrigation dates, that influenced defendant to terminate the right to proceed. The chief construction engineer, Mr. Bloodgood, testified that these latter dates were “uppermost” in his mind and “more important * * * than the contract completion date was to us” (D Tr. 53). The engineer on the site, Mr. Bierce, admitted that, “it is true that at the time of the termination of the contractor’s right to proceed that sufficient time remained to complete all work under the contract within the alloted 450 day contract time” (DX 56, p. 63).
Moreover, those factors which had resulted in past delays and which were offered as the reasons for termination were largely remedied. Plaintiff had secured a competent superintendent and arranged for sufficient capital to continue his operations under the contract. Pie had completed approximately half the actual work required, with 40 percent of the contract time remaining. That sufficient time remained is suggested by the fact that despite considerable added delays resulting after termination from the preparations required by the new contractor secured by the surety, the contract was in fact completed over a month before the over-all completion date.
Termination of plaintiff’s right to proceed further on all contract work was therefore beyond the authority of Article 9. Accordingly, plaintiff may maintain an action for breach of contract.
There remains, however, the issue whether plaintiff is precluded from recovery for the termination of his right to proceed with that portion of the contract work required to permit the irrigation flows specified in paragraphs 37 and 38 of Specifications 2906. We hold that he is so precluded. *339 The work here in question is a “separable part” of the total contract work within the meaning of those words as employed in Article 9.
Paragraph 38 required that the plaintiff-contractor
* * * shall construct and maintain all necessary cofferdams, all channels, flumes, and/or other temporary diversion and protective works; shall furnish all material required therefor; and shall ¡furnish, install, maintain, and operate all necessary pumping and other equipment for unwatering the site of the work, and for maintaining the foundation and 'other parts of the work free from water as required for the construction of each part of the work.
The erection, installation, and maintenance of these cofferdams, etc., was wholly separate from and incidental to the construction of the Diversion Dam (the end product, as it were, envisioned under this contract), albeit of critical importance because of the necessity for releases to the Carlsbad Irrigation District before it was possible to complete the main construction. These devices were to be of temporary utility only in the interim, removed or leveled (paragraph 38 provides) before the July completion date.
Also a “separable part” of the total work were the precautions required under paragraph 37, whereby the existing Fort Sumner Canal was to be maintained from April 5 onward in such condition as to be able to accept the specified release of water to the Fort Sumner Irrigation District.
Article 9, set out above in pertinent part, treats of the situation where the contractor fails to prosecute a separable part .of the contract “with such diligence as will insure its completion within the time specified in Article 1” apart from and differently than the situation where he fails to prosecute the work as a whole “with such diligence as will insure its completion within the time specified in Article 1.” It is the right to proceed with the whole of the contract work which the Government may terminate in the latter case, whereas in the former, at issue here, it is only the right to proceed with “such [i.e., the separable part] of the work as to which there has been delay.”
*340 Such is the clear interpretation of Article 9. The language employed in the first sentence of Article 9 indicates an intent to treat of two separate situations. It does not appear to vest in the Government the option, upon the contractor’s failure diligently to prosecute a separable part of the work, to terminate the whole of the work. Indeed, if such separate treatment be not intended, the use of the words “or any separable part thereof” is wholly superfluous. This interpretation is reached, moreover, in the light of the rule that provisions authorizing termination for anticipatory breach effect a result in the nature of a forfeiture, and are not liberally to be construed. 'Williams v. United States, 26 Ct. Cl. 132, 14-1 (1891).
Plaintiff suggests that any termination exercised under Article 9 is wrongful, because that Article authorizes termination only where “completion within the time specified in Article 1” is not insured. Article 1, he continues, specifies only the over-all completion date, when it states, “The work * * * shall be completed as provided in paragraph 22 of Specifications No. 2906” (paragraph 22 providing for that over-all completion date of 450 days following receipt of notice to proceed). Plaintiff’s suggestion is incorrect, however, because Article 1 provides as well that “the contractor shall * * * perform the work * * * in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows : Specifications No. 2906 and Supplemental Notices No. 1 and 2 * * Thus Article 1 specifies not only the general completion date of July 26 provided in paragraph 22 but also the irrigation flow deadlines of March 1 and April 5 as provided in paragraphs 38 and 37, respectively, of Specifications No. 2906 which relate to the separable part of the work.
Plaintiff further seeks a refund of $1,383.04, the interest, penalties, and lien fees due on withholding taxes admittedly delinquent for the taxable years 1950- and 1951. He alleges that imposition thereof was improper, because his inability to make remittance by the date due would not have occurred *341 were it not for defendant’s termination and resultant damages to plaintiff. This claim for refund is time-barred. The petition here was not filed within 2 years of disallowance as required under the 1939 Internal Revenue Code which governed the 2 years in question (26 U.S.C. § 3772 (1952 ed.)).
Judgment is entered for plaintiff for those damages which resulted from the termination of his right to proceed with the contract work other than that work required to meet the deadlines for irrigation releases.[2] The amount of recovery will be determined pursuant to Rule 38(c).
The third party, Hartford Accident and Indemnity Company, is dismissed without prejudice as a party to this action.
BINDINGS OK PACT
The court, having considered the evidence, the report of Trial Commissioner Mastin Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:

Introductory Statement

The plaintiff, Arthur L. Murphy, alleges that he was damaged in several respects as a result of the action of the Government in terminating his right to proceed with the work under a 1950 contract for the construction of the Fort Sumner Diversion Dam across the Pecos River in New Mexico.
At the trial of the case, the commissioner entered an order limiting the trial to the issues of law and fact relative to the right of the plaintiff to recover. Determination of the amount of recovery, if any, was reserved for further proceedings.
Mr. Murphy, who is more than 80 years old and not a lawyer, has acted as his own attorney in conducting the litigation. Although his claims against the Government have not been articulated in the petition or at the trial as clearly as would be desirable, they appear to involve the following *342 contentions: (1) the Government acted improperly in terminating his right to proceed with the work under the contract for the construction of the Fort Sumner Diversion Dam; (2) the Government acted improperly in delivering to the Hartford Accident and Indemnity Company, which was the bonding company under the contract and assumed the responsibility for the completion of the dam after the contractor’s right to proceed was terminated, a payment check that included earnings which the contractor had made prior to the termination; and (3) the Government acted improperly in assessing and collecting penalties and interest in connection with the tardy payment by Mr. Murphy of certain Federal taxes for the last half of 1950 and the first quarter of 1951, because (according to Mr. Murphy) his failure to pay the taxes in time was due to financial difficulties caused by the wrongful action of the Government in terminating his right to proceed with the work under the contract previously mentioned.
The plaintiff alleged in the petition that the Government terminated his right to proceed under the contract because of pressure exerted by the Hartford Accident and Indemnity Company.[3] Upon motion by the Government under Rule 19 (b), a notice was served on the Hartford Accident and Indemnity Company, which entered an appearance, filed an answer as a third party defendant, and participated in the subsequent proceedings.

The Termination

1. The plaintiff, Arthur L. Murphy, is a resident of Los Angeles, California. He has had extensive experience in the construction industry as a contractor in connection with the building of business houses, schools, private residences, and roads. However, prior to entering into the contract that is involved in the present case, the plaintiff had never been involved in the construction of a dam across a river.
*343 2. In February 1950, tbe Chief Engineer of the Bureau of Reclamation, Department of the Interior, whose office was located in Denver, Colorado, issued an invitation for bids on a contract for the construction of the Fort Sumner Diversion Dam across the Pecos River at a point near Fort Sumner, New Mexico. The dam was to be a part of the Fort Sumner Project of the Bureau of Reclamation. The invitation stated that bids would be received at the office of the Bureau of Reclamation in Fort Sumner until 10 a.m., m.s.t., on March 2,1950.
3. The plaintiff was interested in submitting a bid pursuant to the invitation mentioned in finding 1. However, because of the plaintiff’s lack of previous experience in heavy construction work of the type involved in the Fort Sumner Diversion Dam job, it seemed improbable that the plaintiff would be able to qualify for the necessary bid, performance, and payment bonds in connection with the proposed undertaking. Because of this problem, the plaintiff entered into an arrangement with Nathan A. Moore, a man with extensive experience and an established reputation in heavy construction work, whereby the plaintiff and Mr. Moore, purporting to be joint venturers, would apply for the necessary bonds and submit a bid on the contract for the construction of the Fort Sumner Diversion Dam. However, the actual agreement between the plaintiff and Mr. Moore required the plaintiff to furnish all the funds that might be needed in performing the work under the proposed contract, and it vested in him the full authority and responsibility for the administration of the contract. Mr. Moore was to be “relieved of and from any and all of said duties with respect thereto.” The agreement further provided as follows:
(4) The primary purpose of this agreement and of making said bid as joint-venturer is the furnishing, by second party [Moore], of his bond-ability to and with first party [plaintiff] tor the execution and delivery of any and all necessary and proper labor and material bonds, and faithful performance bond or any other and further bonds necessary and required to be filed with said Bureau of Reclamation and to this end, second party [Moore] does agree to furhish [sic] said bond-ability *344 as and when required upon execution of formal contract for said project.
(5) In consideration of the foregoing it is mutually agreed that there shall and will be paid to first and second parties, each, the sum of $9,000.00 from and out of the first $18,000.00 realized and received as a profit in and upon, and for said project; provided that in the event there shall be any profit realized from the performance and completion of the said project in excess of $50,000.00 there shall be paid to the second party [Moore] 10% of said excess and to first party [plaintiff] 90% of said excess.
(6) It is further agreed that insofar as any loss which may or might be suffered or sustained as a result of operations on said project first party [plaintiff] shall and will expressly assume the total loss, it being agreed second party [Moore] will not be required to absorb nor pay any of said or such loss.
4. The plaintiff and Nathan A. Moore, as joint venturers, applied to the Los Angeles, California, office of the Hartford Accident and Indemnity Company, a corporation organized and existing under the laws of the State of Connecticut, for the issuance of bonds in connection with the Fort Sumner Diversion Dam job. The application stated (among other things) as follows:
Fourth: In further consideration of the execution, or the procurement of the execution, of said bond, or bonds, as surety or co-surety, the undersigned, as of this date, hereby assigns, transfers and sets over to the Company, and also subrogates the Company to, all right and property of the undersigned in, and growing in any manner out of, said contract * * * or any extensions, modifications, changes or alterations thereof, or additions thereto, and all rights and property of the undersigned in and to all monies, securities, warrants, checks, or other evidences of indebtedness, including but without limiting the generality of the foregoing, deferred and reserved payments, current and earned estimates, and final payments, that may be due and payable to the undersigned thereunder * * *. The undersigned hereby authorizes and empowers the Company, and to this end the Company is hereby irrevocably constituted and appointed the attorney-in-fact of the undersigned in its own name, or in the name of the undersigned, to receive, sue for, or otherwise collect, and receipt and give acquittance for, *345 all such monies, securities, warrants, checks or other evidences of indebtedness, and if necessary, or required, to endorse the name of the undersigned on any such securities, warrants, checks or other evidences of indebtedness, and to hold the same as security to protect it from and against any and all liability, loss, costs, damage and expense of every nature or kind, including attorney’s fees, which the Company may sustain or incur, or which may be imposed, or sought to be imposed, upon it under, or by reason of, said bond, or bonds * * * and for the payment of any and all other indebtedness and liability of the undersigned to the Company up to the sum of One Million Dollars ($1,000,000), with the right, which right is hereby expressly given and granted to tlae Company, to cash, discount, or sell all or any part of such securities, warrants, checks or other evidences of indebtedness, and to use all such monies, including the proceeds of such securities, warrants, checks or other evidences of indebtedness to discharge such liability and pay, or reimburse itself for, such loss, costs, damage and expense, including attorney’s fees, and such other indebtedness or liability.
5. Arrangements having been made with the Hartford Accident and Indemnity Company for the issuance of the necessary bonds in connection with the Fort Sumner Diversion Dam job, the plaintiff went from Los Angeles to Fort Sumner. He was accompanied by Lowell M. Anderson, an experienced construction man whom the plaintiff had selected to superintend the construction of the dam, if the contract could be obtained. The trip from Los Angeles was made by automobile. The plaintiff and Mr. Anderson left Los Angeles on February 28, 1950, and they reached Fort Sumner in the afternoon of March 1. Mr. Anderson worked most of that night hurriedly making cost estimates and otherwise preparing a bid for submission to the Bureau of Eeclamation by 10 o’clock the next morning. On the basis of Mr. Anderson’s work, a bid was submitted by the plaintiff, in the names of himself and Nathan A. Moore, to the Bureau of Eeclamation shortly before 10 a.m. on March 2, 1950.[4] The bid was supported by a bid bond issued by the Hartford Accident and Indemnity Company (which, for the sake of convenience, will *346 usually be referred to hereafter in the findings as “Hartford”) .
6. When the bids on the contract for the construction of the Fort Sumner Diversion Dam were opened by the Bureau of [Reclamation shortly after 10 a.m. on March 2,1950, it was discovered that the bid which the plaintiff had submitted was the lowest bid by about $76,000. After the opening of the bids, Mr. Murphy returned to Los Angeles.
7. (a) On March 17, 1950, the Bureau of Reclamation sent a telegram to the plaintiff and Nathan A. Moore at the plaintiff’s address in Los Angeles, stating that:
You are hereby awarded contract for construction and completion of Fort Sumner Diversion Dam, under Specifications No. 2906, Fort Sumner Project, New Mexico. Contract and bond forms will follow. Acknowledge receipt this telegram.
(b) The plaintiff received the telegram quoted in paragraph (a) of this finding on March 17,1950, and on the same date he sent a telegram to the Bureau of Reclamation acknowledging receipt of the notice of award.
8. (a) A formal contract for the construction of the Fort Sumner Diversion Dam was entered into as of March 17, 1950. The plaintiff and Nathan A. Moore signed the contract as “Contractor,” and the Chief Engineer of the Bureau of Reclamation signed the contract as contracting officer for the United States. The contract was numbered X2r~18946. Attached to the contract and made a part of it was a document designated as Specifications No. 2906, together with documents designated as Supplemental Notices Nos. 1 and 2 to the specifications. (Contract No. I2r-18946, including Specifications No. 2906 and Supplemental Notices Nos. 1 and 2, will usually be referred to hereafter in the findings as “the contract.”)
(b) The contract covered 84 separate items of work involved in the construction of the Fort Sumner Diversion Dam. It provided for the payment of lump-sum prices to the contractor on 7 items of work, and for the payment of unit prices to the contractor on 27 items of work. The total contract price was given as $457,760, but this was necessarily *347 an estimate in view of the large number of items that were to be paid for on a nnit-price basis for quantities that were expressly said to be “approximations.”
(c) Article 4 of the contract related to the subject of “Changed conditions” and provided as follows:
Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his •duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
(d) Article 8 of the contract related to the subject of “Superintendence by contractor” and provided as follows:
The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him.
(e) Article 9 of the contract related to the subject of “Delays — Damages” and provided in part as follows:
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1,[5] or any extension thereof, * * * the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute *348 the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. * * * Provided, That the right of the contractor to proceed shall not be terminated * * * because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, * * * acts of the Government * * *, if the contractor shall within 10 days from the beginning of any such delay * * * notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay_ and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
(f) Article 16 of the contract related to the subject of “Payments to contractors” and provided in part as follows:
(a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. * * *
(&) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract * * *.
(g) Paragraph 12 of Specifications No. 2906, as amended by Supplemental Notice No. 2 (February 27, 1950), related to the subject of “Protests” and provided as follows:
If the contractor considers any work demanded of him to be outside of the requirements of the contract, or considers any record or ruling of the contracting officer or of the inspectors to be unfair, he shall immediately upon such work being demanded or such record or ruling *349 being made, ask, in writing, for written instructions or decision, whereupon he shall proceed without delay to perform the work or to conform to the record or ruling, and, within twenty (20) calendar days after date of receipt of the written instructions or decision * * * he shall file a written protest with the contracting officer, stating clearly and in detail the basis of his protest. Except for such protests as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions, or decisions of the contracting officer shall be final and conclusive. * * *
(h) Paragraph 22 of Specifications No. 2906 related to the subject of “Commencement, prosecution, and completion of work” and provided in part as follows:
The contractor shall begin work within thirty (80) calendar days after date of receipt of notice to proceed and shall complete all of the work within four hundred and fifty (450) calendar days from the date of receipt of such notice. * * *
(i) Paragraph 24 of Specifications No. 2906 related to the subject of “Construction program” and provided in part as follows:
Within thirty (30) calendar days after date of receipt of notice to proceed, the contractor shall furnish the contracting officer a complete construction program showing in detail his proposed program of operations, which construction program shall provide for orderly performance of the work. * * * Revised construction programs shall be submitted at intervals of not more than 6 months, and, in addition thereto, the contractor shall immediately advise the contracting officer of any proposed changes in his construction program.
(j) Paragraph 25 of Specifications No. 2905 provided that the Government would furnish (among other things) the cement needed by the contractor for concrete, mortar, and grout.
(k) Paragraph 37 of Specifications No. 2906 related' to the subject of “River flow and interference with flow in Fort Sumner Canal” and provided in part as follows:
* * * The construction to be performed under these specifications will replace portions of the existing canal and structures of the Fort Sumner Canal, and these portions of the construction work will have to be per *350 formed at times wlien water is not flowing in tbe existing canal. The existing canal will be carrying water from approximately April 5 to October 31, and the contractor will not be permitted to interrupt the flow of the canal during that period. It is required that a continuous flow of 100 cubic feet per second of water be supplied through the existing canal during the irrigation season. The contractor shall make necessary provisions for supplying this quantity of water by whatever method he. elects. If at any time immediately prior to or during the irrigation season the contracting officer determines that the contractor’s methods are inadequate to guarantee continued delivery of 100 cubic feet per second in the canal, the Government reserves the right to enter upon the site of the work and to take such minimum action as may be necessary to guarantee the required flow of water.
(l) Paragraph 38 of Specifications No. 2906, as amended by Supplemental Notice No. 1 (February 21, 1950), related to the subject of “Diversion and care of river during construction and unwatering foundations” and provided in part as follows:
* * * In addition to other requirements of these specifications for passing natural or required flow of water past the diversion dam, the contractor shall arrange his operations to permit the passage of irrigation releases from Alamogordo Dam to the Carlsbad Project. The quantity of water passed during each release will be approximately 20,000 acre-feet and the rate of flow during such releases will be between 1,000 and 2,000 cubic feet per second. Not more than one release will be made during any one month and not more than 3 releases will be made during any one irrigation season, March through September, inclusive. The contracting officer will notify the contractor of such releases approximately 7 days in advance of the beginning of such releases. The contractor shall not interrupt or interfere with the natural or required flow of water past the dam for irrigation or other purposes without the approval of the contracting officer. * * *
(m) Paragraph 43 of Specifications No. 2906 related to the subject of “Excavation for structures” and provided in part as follows:
* * * All excavations shall be made to the lines, grades, and dimensions shown on the drawings or established by the contracting officer. * * * Any and all *351 excess excavation or overexcavation performed by the contractor for any purpose or reason, except as may be ordered in writing by the contracting officer, and whether or not due to the fault of the contractor, shall be at the expense of the contractor. * * *
9. Hartford was the surety on the performance and payment bonds which the plaintiff and Nathan A. Moore submitted to the Bureau of Reclamation under the date of March 17,1950, in connection with the signing of the contract. The performance bond was in the amount of $229,000 and the payment bond was in the amount of $228,'880.
10. The plaintiff and Nathan A. Moore entered into a supplemental agreement on April 24, 1950. Under this agreement, Mr. Moore made to the plaintiff a secured loan in the amount of $14,000, bearing 6 percent interest. The supplemental agreement further provided as follows:
(3) Fist [sic] party [plaintiff] hereby unconditionally guarantees to pay to the Second Party [Moore] the sum of TEN THOUSAND and no/100 DOLLARS ($10,000.00) as a consideration for Second Party [Moore] becoming a joint-venturer and for the use of his bondability and the acceptance thereof by the Surety Company and of the above described loan of FOURTEEN THOUSAND and no/100 DOLLARS ($14,-000.00) * * *.
(4) In consideration of the foregoing, Second Party [Moore] waives and forfeits any and all claim and right to any profit in and upon said project other than as herein provided, as referred to in Paragraph Five (5) of said contract of March 14,1950. * * *
11. On April 26, 1950, the Bureau of Reclamation sent to the plaintiff and Nathan A. Moore at the plaintiff’s address a notice to proceed under the contract. The notice was received by the plaintiff on April 29,1950. This fixed the date for the completion of the contract as July 23, 1951.
12. The plaintiff began work under the contract in the latter part of May 1950. The interval since the receipt of notice regarding the award of the contract (see finding 7) had been spent by Lowell M. Anderson, whom the plaintiff had selected to serve as superintendent of the Fort Sumner Diversion Dam job, in making plans for the performance of the work under the contract, in assembling adequate equip *352 ment at the job site, and in recruiting the necessary personnel. Mr. Anderson was a competent and experienced construction superintendent; and after the work under the contract was begun in late May, good progress was made on the job under Mr. Anderson’s superintendence until the end of September 1950. However, the plaintiff was dissatisfied with Mr. Anderson because the latter used only union members as workmen on the job (the plaintiff regarded union labor as more expensive than nonunion labor), because sometimes, when the job was being operated on a 2-shift basis, Mr. Anderson would arrive at the job site after the first shift had already begun work (the plaintiff believed that the superintendent should be present at all times when work was in progress), and because Mr. Anderson used a pick-up truck (which was part of the job equipment) more often than the plaintiff thought proper in driving between the job site and Fort Sumner, a distance of approximately 5 miles. Accordingly, the plaintiff handed to Mr. Anderson, after the second shift had finished work on September 30, 1950, a written note stating as follows:
Because of your unsatisfactory work and failure to meet obligations; you are discharged Effective at once and you are futher [sic] ordered to stay away from the Ft. Sumner Dam property.
13. With Lowell M. Anderson’s departure from the Fort Sumner Diversion Dam job, the job was completely shut down after September 30, 1950 (except for office personnel and a pump operator, who kept the dam excavation de-watered) while the plaintiff went to Los Angeles in search of another superintendent.
14. The plaintiff employed Dole J. Kelly to succeed Lowell M. Anderson as superintendent of the Fort Sumner Diversion Dam job. Mr. Kelly, like Mr. Anderson, was a competent and experienced construction superintendent. The plaintiff and Mr. Kelly went from Los Angeles to Fort Sumner, arriving at the latter place on or about October 12, 1950. It took Mr. Kelly more than a week to reassemble a work force and resume normal operations on the job, so that the full-scale resumption of work under the contract did not occur until on or about October 20,1950. Hence, work under *353 the contract was at a virtual standstill for approximately 3 weeks following the discharge of Lowell M. Anderson by the plaintiff. In connection with the resumption of work, a difficulty arose with the labor union whose members had previously been employed on the job. However, this matter was adjusted satisfactorily, through the intervention and assistance of a representative of the Bureau of Reclamation.
15. On October 18, 1950, during the work stoppage following the discharge of Lowell M. Anderson as superintendent of the Fort Sumner Diversion Dam job, the Construction Engineer of the Bureau of Reclamation at Fort Sumner addressed a letter to the plaintiff and Nathan A. Moore, expressing concern over whether the contractor would be able to complete the work to a sufficient degree that water could be delivered to the main canal for the Fort Sumner Irrigation District by April 5, 1951, as required by paragraph 37 of Specifications No. 2906 (see finding 8(k)).
16. Dole J. Kelly served as superintendent of the Fort Sumner Diversion Dam job until sometime in December 1950. During the period of his superintendence, the plaintiff began to experience difficulty in financing the work under the contract, so that sometimes there was delay in obtaining materials that were needed for the work or parts that were needed for the repair and maintenance of equipment on the job. These delays impeded the progress of the work.
17. (a) During the period of Dole J. Kelly’s superintendence, the plaintiff was delayed at one time for approximately a week in connection with the pouring of concrete because of a failure on the part of the Government to provide the proper cement, as required by paragraph 25 of Specifications No. 2906 (see finding 8 (j)).
(b) Also, the plaintiff was required by the Government during Mr. Kelly’s superintendence to do a substantial amount of extra excavation work, in addition to that provided for in the plans and specifications under the contract. When the excavation for the dam was completed in accordance with the plans and specifications, it was discovered that the base material over a considerable portion of the area was inadequate to provide a proper foundation for the dam, and the plaintiff was required by the Government to excavate an *354 additional depth of approximately 10 feet within the affected area. The extra excavation and the preparation of the affected area for the pouring of concrete required approximately 10 days’ time. The plaintiff was paid for the extra excavation at the proper unit price prescribed in the contract.
(c) The plaintiff did not request any extension of the time fixed in the contract for the completion of the work •because of the incidents referred to in paragraphs (a) and (b) of this finding, and he did not protest against the performance of the extra work.
18. In letters dated December 15 and 22, 1950, and addressed to the plaintiff and Nathan A. Moore, the Acting Construction Engineer of the Bureau of Reclamation at Fort Sumner called attention to the fact that the contractor was behind schedule in connection with the pouring of concrete.
19. The plaintiff discharged Dole J. Kelly as superintendent of the Fort Sumner Diversion Dam job sometime in the latter part of December 1950. The plaintiff had concluded that Mr. Kelly was not dependable. (The basis for the plaintiff’s conclusion is not clearly revealed by the evidence in the record.)
20. The plaintiff employed Cuvier Greene to succeed Dole J. Kelly as superintendent of the Fort Sumner Diversion Dam job. Mr. Greene, who was also a competent construction superintendent, took over the job within a few days after Mr. Kelley’s departure. In the meantime, the plaintiff’s office manager at the job site had served as acting superintendent during the interval between Mr. Kelly’s departure and Mr. Greene’s arrival, so that the hiatus between superintendents did not substantially affect the progress of the work.
21. Cuvier Greene served as superintendent of the Fort Sumner Diversion Dam job for the plaintiff until January 21, 1951. During his superintendence, the plaintiff’s financial difficulties increased, and the superintendent frequently lacked adequate funds for the purchase of materials that were needed for the work under the contract and for the purchase of spare parts that were necessary in order to maintain and repair the equipment on the job. This caused delay and thus impeded the progress of the work.
*355 22. In letters dated December 29, 1950, and January 5, 1951, and addressed to the plaintiff and Nathan A. Moore, the Acting Construction Engineer of the Bureau of Reclamation at Fort Sumner called attention to the fact that the contractor was behind schedule in the pouring of concrete.
23. Cuvier Greene resigned as superintendent of the Fort Sumner Diversion Dam job on January 21,1951. The principal reason for his resignation was the lack of adequate funds for the effective prosecution of the work under the contract. Following Mr. Greene’s resignation, the job was completely shut down, except that the plaintiff’s office personnel kept the pumps going, and thus kept the excavation dewatered, for several days, but the pumps then became inoperative and the excavation began to fill with underground water and quicksand.
24. In a letter dated January 22, 1951, the Construction Engineer of the Bureau of Reclamation at Fort Sumner addressed a letter to the plaintiff and Nathan A. Moore, complaining about a lag upon the part of the contractor in meeting the concrete placing schedule. This letter stated (among other things) that:
* * * Your failure to meet your construction program * * * and your * * * concrete placing schedule indicates that delivery dates for passage of irrigation water to the Carlsbad Irrigation District by March 1, 1951 and to the Fort Sumner Irrigation District on April 5, 1951, as required by Paragraphs 38 and 37 respectively of Specifications No. 2906, will not be met.
We suggest that you take action to insure that irrigation water delivery can be made as required in Specifications No. 2906. * * *
25. (a) Information regarding the shutdown of the Fort Sumner Diversion Dam job on January 22, 1951, was promptly reported by personnel of the Bureau of Reclamation at Fort Sumner to the contracting officer in Denver. At the time, the personnel of the Bureau in the field believed that the first release of irrigation water from the Alamogordo Dam (which was upstream from the Fort Sumner Diversion Dam) for the Carlsbad Irrigation District (which was downstream from the Fort Sumner Diversion Dam) in the 1951 irrigation season would be needed by the Carlsbad Irriga *356 tion. District on or about March 1, 1951; and such personnel was concerned over what seemed to be the likelihood that the work on the Fort Sunmer Diversion Dam would not be at such a stage as of March 1 that the released water could be safely passed through the partially completed dam in accordance with the requirement of paragraph 38 of Specifications No. 2906 (see finding 8 (1)). Also, the field personnel of the Bureau was concerned over what seemed to be the likelihood that as of April 5,1951, the work on the Fort Sumner Diversion Dam would not be at such a stage as to permit the furnishing of water to the Fort Sumner Irrigation District (which was also downstream from the Fort Sumner Diversion Dam) in accordance with paragraph 37 of Specifications No. 2906 (see finding 8 (k)).
(b) The contracting officer on or about January 23, 1951, communicated with the Commissioner of Eeclamation in Washington, D.C., and requested from the Commissioner permission to terminate the contractor’s right to proceed.
26. A teletype dated January 24, 1951, from the Acting Commissioner of Eeclamation in Washington, D.C., to the contracting officer in Denver stated in part as follows:
* * * You are hereby authorized subject to concurrence by Eegional Director to terminate right to proceed under contract I2r-18946 with A. L. Murphy and Nathan A. Moore, and take such steps you consider appropriate to expedite construction.
27. On January 26, 1951, the Construction Engineer of the Bureau of Eeclamation at Fort Sumner addressed a letter to the plaintiff and Nathan A. Moore, in which he again complained that the contractor was behind schedule in the placing of concrete. He stated (among other things) that “The above lag * * * emphasizes that delivery dates for passage of irrigation water will not be met.”
28. Information regarding the authorization from the Commissioner of Eeclamation for the termination of the contractor’s right to proceed (see finding 26) was disclosed by personnel of the Bureau of Eeclamation to Hartford, and that company was informed that it would be given the option to complete the contract in the event of a termination. The urgent necessity of meeting the anticipated deadlines for *357 the initial releases of irrigation water to the Carlsbad and Fort Sumner Irrigation Districts was mentioned by the Bureau. Hartford on January 27, 1951, entered into an arrangement with Nathan A. Moore whereby the latter was to complete the work under the contract for the surety if the contractor’s right to proceed should be terminated by the Bureau of Declamation.
29. In the meantime, following Cuvier Greene’s resignation as superintendent of the Fort Sumner Diversion Dam job on January 21, 1951, the plaintiff had busied himself at the task of locating another superintendent to succeed Mr. Greene, and of obtaining additional financing for the completion of the work under the contract. By January 29,1951, the plaintiff had located an experienced construction superintendent by the name of Davis (or Davies), and the latter had agreed to take over the job of superintendent, although he had not yet arrived at Fort Sumner. The plaintiff had also arranged to borrow $50,000 from a New Mexico man by the name of W. D. Willson. The arrangements for a new superintendent and for new financing were disclosed by the plaintiff to personnel of the Bureau of Declamation at a conference that was held in Fort Sumner on January 29, 1951, to discuss the problem of whether the plaintiff should be permitted to proceed with the work under the contract. The representatives of the Bureau at the conference were not convinced that the plaintiff would be able to meet the expected deadline of March 1,1951, for the release of irrigation water to the Carlsbad Irrigation District and the deadline of April 5, 1951, for the release of water to the Fort Sumner Irrigation District.
30. The principal representative of the Bureau of Declamation at the conference on January 29,1951 (see finding 29), sent the following telegram to the contracting officer in Denver on January 30,1951:
De Specs. 2906 for construction Fort Sumner Diversion Dam. Decommend letter terminating contractor’s right to proceed be sent immediately, Murphy showed evidence he has new financial backing to extent of $50,000 but in view of present debts doubt that this will permit job to proceed. Also doubt Murphy’s ability to get qualified superintendent to prosecute work as he *358 insists on managing job personally. Effects on [sic] past labor trouble are an important factor in progress. Recommend you advise Al Blackburn [of Hartford’s Los Angeles office] by phone of action taken. * * * Regional Director not only concurs my recommendations but insists action be taken because of time factor. January earnings approximately $40,000 instruct Bierce procedure on this estimate.
31. (a) On January 30, 1951, the contracting officer in Denver addressed the following letter to the plaintiff and Nathan A. Moore:
You are hereby notified that your right to proceed is terminated under Contract No. 12r-18946 [sic], Specifications No. 2906, for construction and completion of the Fort Sumner Diversion Dam, Fort Sumner Project, New Mexico. This action is taken pursuant to the provisions of Article 9 of your contract and is necessary because you have consistently refused or failed to prosecute the work with such diligence as to insure its completion within the time specified in your contract. Accordingly, if your surety does not promptly elect to take over and complete the work, with the approval of the Bureau, subject to all the terms and conditions of the contract, the Government will take over the work and prosecute it to completion, by contract or otherwise. In this latter event, you and your surety will be held liable to the Government for any excess cost occasioned the Government thereby.
As further provided in Article 9 of your contract, you are directed to leave intact at the site of the work all materials, appliances and plant which have been used or which are capable of being used in the performance of this work.
(b) A copy of the letter quoted in paragraph (a) of this finding was transmitted by the Bureau of Reclamation to Hartford.
32. On January 30, 1951, the contracting officer in Denver addressed the following letter to Hartford:
The right of A. L. Murphy and Nathan A. Moore to proceed with the construction of the Fort Sumner Diversion Dam, Fort Sumner Project, New Mexico, under Contract No. I2r-18946, Specifications No. 2906, has been terminated this date. A copy of the termination of its right to proceed is enclosed.
You are requested to advise this office not later than *359 February 7, 1951, whether you desire to take over and complete this work under the provisions and subject to all of the terms and conditions of the contract. If not, it will be necessary for the Government to take over the work and prosecute it to completion, by contract or otherwise, and the contractor and your company shall be liable to the Government for any excess cost occasioned the Government thereby, all as provided in Article 9 of said contract.
33. The plaintiff received the termination notice (see finding 31) on or about February 2,1951. He did not have any further connection with the completion of the work under the contract.
34. The contracting officer’s action in terminating the contractor’s right to proceed with the work under the contract was not caused or induced by any pressure or other type of influence exerted by Hartford.
35. As of January 30, 1951, the plaintiff had performed approximately 50 percent of the physical work required of the contractor under the contract. Approximately 60 percent of the time allowed by the contract for its performance, following the receipt of the notice to proceed, had expired.
36. As of January 30, 1951, the partial payments (see finding 8(f)) earned by the plaintiff for work performed under the contract through the month of December 1950, totaling $186,642.71, had been paid to the plaintiff. The plaintiff had earned a partial payment in the amount of $44,819.63 for work performed during the month of January 1951, and the Bureau of Reclamation was withholding a total of $25,718.04 as the retained 10 percent of the plaintiff’s gross earnings under the contract, but these amounts were not paid to the plaintiff.[6]
37. The plaintiff’s financial interests were adversely affected by the action of the contracting officer in terminating the contractor’s right to proceed with the work under the contract.
38. The plaintiff, acting on behalf of himself and Nathan A. Moore, took a timely appeal to the Secretary of the Interior from the decision of the contracting officer terminating *360 their right to proceed with the work under the contract. The appeal was dismissed by an administrative decision dated August 22, 1951, which stated in part as follows:
The essence of the appeal is that at the time when their right to proceed with the work was terminated, the contractors were not in default and sufficient time remained available to complete the contract work within the time specified in article 1 of the contract. * * *
As all work remaining to be completed under the contract at the time of the termination has been completed by the surety, the appeal of the contractors is in the nature of a claim for damages because of the Government’s alleged breach of the contract in terminating the contractors’ right to proceed with the work. Such a claim is in the category of a claim for unliquidated damages. The legal principle that an administrative officer of the Government has no authority to entertain or settle a claim for unliquidated damages is well established. * * * Accordingly, irrespective of the merits of the contractors’ claim, there is no alternative but to deny the claim as one for unliquidated damages.
30. As of January 30, 1951, when plaintiff’s right to proceed with the work under the contract was terminated the plaintiff was prosecuting the work with such diligence as to complete it before the final completion date of July 23, 1951. Plaintiff has, however, failed to establish that he was prosecuting the work with such diligence as to be able to complete the work necessary to permit the release of irrigation water to downstream districts by the times fixed in paragraphs 37 and 38 of Specifications No. 2906. It was concern over these aproaching deadlines and not over the final completion date which resulted in the notice to terminate.

The Completion of the Contract

40. Pursuant to the notification from the contracting officer (see finding 32), Hartford (acting through Nathan A. Moore for approximately 2 weeks and then through the N. M. Saliba Company) took over the performance of the work under the contract. A superintendent for the surety’s agent arrived at the job site on or about February 4, 1951, and he immediately began the task of reassembling a work force, *361 repairing the equipment which, the plaintiff had been required to leave at the job site (much of which had deteriorated due to the lack of proper maintenance and the lack of protection from the elements during the period of the shutdown of the job following Cuvier Greene’s resignation as superintendent), bringing in a substantial amount of additional equipment, dewatering the excavation (which was completely filled due to the seepage of underground water and quicksand during the shutdown), and performing the necessary clean-up work. These tasks required about 2 weeks’ time. After that, work under the contract was resumed on a full-scale basis and was diligently carried forward without any further shutdown until the work was finally completed. A 3-shift operation around the clock, 6 days in the week, was conducted for several weeks after the resumption of work on a full-scale basis, in order to prepare for the release of irrigation water to the Carlsbad Irrigation District in March 1951 (see finding 42).
41. Unpaid bills for labor and materials which had accumulated against the plaintiff prior to the termination of his right to proceed with the work under the contract Avere paid by Hartford in the total amount of $88,171.20.
42. The necessary preparations to permit the passing of the first release of irrigation water from the Alamogordo Dam for the Carlsbad Irrigation District in the 1951 irrigation season were completed by Hartford’s agent on March 19, 1951, and the initial water release for the Carlsbad Irrigation District was made by the Bureau of Reclamation on the following day.
43. The necessary preparations to permit the initial release of 1951 irrigation water for the Fort Sumner Irrigation District were completed by Hartford’s agent in time for the initial release of such water to be made on or shortly after April 5,1951.
44. The work under the contract was finally completed by Hartford’s agent on June 19, 1951, which was more than a month prior to the final date fixed in the contract for such completion.
45. The total cost to Hartford of completing the work under the contract amounted to $252,506.91. This figure *362 includes a fixed fee of $6,500 which Hartford paid to the N. M. Saliba Company, but it does not include the $88,171.20 which Hartford paid to the plaintiff’s creditors (see finding 41).
46. Hartford collected from the Government a total of $275,766.32 in connection with the completion of the work under the contract.

The Disputed Payment Oheck

47. On June 16, 1952, the plaintiff wrote a letter to the Comptroller General of the United States, stating in part as follows:
I hereby earnestly request payment of all moneys earned and unpaid to me on the above mentioned contract prior to and including Jan. 31,1951 the date upon which the contracting officers signed the notice terminating my right to continue the work on the contract.
48. The final payment made by the Government in connection with the completion of the work under the contract was a check in the amount of $70,270.49. This check included the partial payment in the amount of $44,819.63 which the plaintiff had earned under the contract for work performed in January 195Í, plus the amount of $25,718.04 representing the retained 10 percent of the plaintiff’s gross earnings under the contract up to the time when his right to proceed was terminated (see finding 36), less the sum of $20,267.18 which was deducted from the final payment under the contract because the Internal Revenue Service had assessed that amount against the plaintiff as delinquent taxes, interest, penalties, and lien fees.[7] The $70,270.49 check also included some earnings that had been made by Hartford in completing (through its agent) the work under the contract.
49. The $70,270.49 check mentioned in finding 48 was issued by the Government under the date of October 20,1952, pursuant to a certificate of settlement prepared by the General Accounting Office on that date. The check was made payable to the plaintiff and Nathan A. Moore, but it was delivered by the Government to a representative of Hartford.
50. (a) The $70,270.49 check was cashed by Hartford, and *363 the proceeds formed part of the total of $275,766.32 which Hartford collected from the Government in connection with the completion of the work under the contract (see finding 46).
(b) In cashing the $70,270.49 check, Hartford had Nathan A. Moore (acting through an atfcorney-in-fact) endorse the check over to Hartford, and Hartford itself (acting through a vice president of the company) endorsed the plaintiff’s name on the back of the check as attorney-in-fact for the plaintiff (see finding 4).
51. On November 19, 1952, the plaintiff wrote a letter' to the Comptroller General of the United States, stating in part as follows:
On or about October 20, 1952 your office issued an order for a check to be made to A. L. Murphy and Nathan A. Moore, number of said check 11968868 in the amount of $70,270.49; by the Treasury Department of the United States, Albuquerque, New Mexico, but delivered to other parties.
This is to inform you that I protest the delivery of said check and question your authority to order, to send, deliver, or give said check to anyone but me at my address above.
You will please cause said check to be canceled and a new one executed and deliver said check to my address above.
52. On January 5, 1953, the plaintiff again wrote to the Comptroller General of the United States, stating (among other things) as follows:
* * * I demand that you deliver to me the check for $70,270.49 in favor of A. L. Murphy and Nathan A. Moore, as required by the contract and the award of the Certificate of settlement and I will take the necessary legal steps to secure the cashing of the check which is my sole property.
53. No payment has been made by the Government to the plaintiff on his claim growing out of the delivery to Hartford of the $70,270.49 check that included the partial payment in the amount of $44,819.63 which the plaintiff had earned under the contract for work performed in January 1951 and the amount of $25,718.04 representing the retained 10 percent of the plaintiff’s gross earnings under the con *364 tract up to the time when his right to proceed was terminated, less the tax deficiency of $20,267.18 which had been assessed against the plaintiff.

The Tax Claim

54. The $20,267.18 tax deficiency which the Government collected from the plaintiff in October 1952, as indicated in finding 48, consisted of delinquent withholding and employment taxes which were due from the plaintiff for the third and fourth quarters of 1950 and the first quarter of 1951, in the total amount of $18,884.14, plus interest in the total amount of $436.83, penalties in the total amount of $944.21 for tardy payment, and lien fees in the total amount of $2.
55. On or about December 1, 1952, the plaintiff filed with the Internal Eevenue Service a claim for the refund of the $1,383.04 which had been collected from him as interest, penalties, and lien fees in connection with the tardy payment of the withholding and employment taxes for the third and fourth quarters of 1950 and the first quarter of 1951 (see finding 54). As a basis for the claim, the plaintiff asserted that his failure to pay the taxes in time was due to the Government’s actions in withholding funds which the plaintiff had earned under the contract and in terminating his right to proceed with the work under the contract.
56. The plaintiff’s tax claim was disallowed by the Internal Eevenue Service on May 13, 1953, and notice of such disallowance was sent to the plaintiff by registered mail on the date mentioned.
57. The present action was begun in the Court of Claims on January 28,1957, which was more than 2 years after May 13, 1953.[8]
58. The evidence in the record indicates that the plaintiff’s failure to pay in time the withholding and employment taxes for the third and fourth quarters of 1950 and the first quarter of 1951 was due in part to the financial difficulties which the plaintiff encountered in performing work under the con *365 tract up to January 30,1951, and in part to the adverse effect of the Government’s action on January 30, 1951, in terminating the plaintiff’s right to proceed with the work under the contract, coupled with the failure of the Government to disburse to the plaintiff the partial payment which he had earned under the contract in January 1951.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover for those damages which resulted from the termination of his right to proceed with the contract work other than that work required to meet the deadlines for irrigation releases. The amount of recovery will be determined pursuant to Eule 38(c) of the rules of this court.
The third party, Hartford Accident and Indemnity Company, is dismissed without prejudice as a party to this action.

 Hartford Accident and Indemnity Company has appeared as a Third Party in this case. Plaintiff has not asked for recovery against it and Hartford is dismissed as a party to the action.

 Plaintiff may not recover from the defendant any sums for wort performed by him which are represented by the check discussed in findings 47 — 53. See finding 4 and footnote 1.

 The plaintiff also asserted in the petition other complaints against the Hartford Accident and Indemnity Company. However, such matters have not been covered in the findings of fact because they do not have any particular bearing on the plaintiff’s action against the Government.

 The Bureau of Reclamation -was unaware of the true nature of the relationship between the plaintiff and Nathan A. Moore, as indicated in finding 3.

 Article 1 of the contract stated that (among other things) “The -work shall be commenced and shall be completed as provided in paragraph 22 of Specifications No. 2906,” -which is partially set out in paragraph (h) of this finding.

+ See findings 47-53 with respect to the disposition of the amounts mentioned in the last sentence of finding 36.

 See findings 54-58 for further information regarding the $20,267.18 deduction.

 See Section 3772(a) (2) of the Internal Revenue Code of 1939, as amended (26 U.S.C., 1952 ed., 3772 (a) (2)), relative to the period of limitation on actions for tax refunds as of May 1953. This subject was later covered by Section 6532(a) (1) of the Internal Revenue Code of 1954.