ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Nelson, Inc. ) ASBCA Nos. 57201, 58166
)
Under Contract No. W912EQ-09-C-0025 )

APPEARANCES FOR THE APPELLANT: Joree G. Brownlow, Esq.
  Cordova, TN

  Dedrick Brittenum, Jr., Esq.
   Brittenum Bruce PLLC
   Memphis TN

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
  Ann M. Bruck, Esq.
  Suzanne Mitchem, Esq.
   Engineer Trial Attorneys
   U.S. Army Engineer District, Memphis

OPINION BY ADMINISTRATIVE JUDGE PEACOCK

    These appeals involve the termination for default of the referenced contract for construction of stone dike extensions and other work at four sites on the Mississippi River. ASBCA No. 57201 is an appeal from the final decision terminating the contract. The Board conducted a nine-day hearing[1] in ASBCA No. 57201 regarding the propriety of the termination. We sustain the appeal. ASBCA No. 58166 involves a termination for convenience settlement proposal claim and appeal which we dismiss as premature.

FINDINGS OF FACT

    1. On 31 July 2009, the U.S. Army Corps of Engineers (Corps or government) awarded the captioned contract to Nelson, Inc. (Nelson or appellant), for $9,241,900, for "Stone Dike Construction at Various Locations in the Mississippi River" (R4, tab 3 at 48, tab 14 at 369). In general, the contract provided for construction of stone dikes and other features at four Mississippi River sites, known as "Loosahatchie," "Robinson Crusoe," "Friars Point," and "Cow Island" (R4, tab 3 at 41). The Loosahatchie work was located at Mississippi River Mile 738.7R AHP in Shelby County, Tennessee; the adjacent Robinson Crusoe work was located at Mississippi River Miles 738.7R AHP to 737.8R

---

[1] The hearing was conducted by Administrative Judge Terrence S. Hartman.

AHP in Shelby County, Tennessee; the Friars Point work was located at Mississippi River Miles 653.0L AHP to 652.7L AHP in Coahoma County, Mississippi; and the Cow Island work was located at Mississippi River Miles 715.2R AHP to 714.6R AHP, in Crittenden County, Arkansas (*id.*).

2. Following bid opening on 16 June 2009, the Corps conducted a pre-award survey to evaluate Nelson's capability to perform. Based on the results of that survey, the Corps concluded that appellant was non-responsible. (R4, tab 9 at 358) On 2 July 2009, the matter of appellant's responsibility was submitted to the U.S. Small Business Administration (SBA) where Nelson filed for a Certificate of Competency (COC) (R4, tabs 9, 10). On 22 July 2009, the SBA issued a COC (R4, tabs, 12, 13).

3. The Friars Point work and the Cow Island work were depicted on a separate set of contract drawings; the Loosahatchie and Robinson Crusoe work was depicted on one set of contract drawings (R4, tab 5 at 314-18 (Friars Point), at 320-25 (Loosahatchie & Robinson Crusoe), at 326-30 (Cow Island)). The adjacent Loosahatchie and Robinson Crusoe work were located approximately 1.5 miles upstream of Memphis, Tennessee. The contract included separate pricing for each activity related to each of the four sites (consisting of, but not at each site, mobilization/demobilization, graded stone, excavation, riprap paving, and standby time), which together totaled to the $9,241,900 lump sum amount for the entire contract. (R4, tab 3 at 48, 50-54) The Loosahatchie activities totaled $590,500; the Robinson Crusoe activities, $542,700; the Friars Point activities, $4,520,600; and the Cow Island activities, $3,578,100 (*id.*). To complete the work at all four locations required the placement of a total estimated quantity of 494,300 tons of stone (R4, tab 3 at 43-45).

4. Part 1.1.1 of the Summary of Work provided the following "Project Description" of the work (R4, tab 3 at 202):

> FRIARS POINT CHEVRON <u>CONTRACT</u>: The work consists of furnishing all plant, labor and materials for constructing Friars Point Chevron Nos. 1 – 3 by placing Graded Stone A and Graded Stone C as well as incidental related work.
>
> LOOSAHATCHIE DIKE <u>CONTRACT</u>: The work consists of furnishing all plant, labor and materials for extending Loosahatchie Bar Dike No. 4 by placing Graded Stone C, and constructing Loosahatchie Bar Chevron No. 1 and Roundpoint Nos. 1 and 2 by placing Graded Stone C as well as incidental related work. No Riprap Paving will be placed.

ROBINSON CRUSOE DIKE CONTRACT: The work consists of furnishing all plant, labor and materials for extending Robinson Crusoe Dike Nos. 3, 4, and 5, and notching Robinson Crusoe Dike No. 5 as well as incidental related work. No riprap Paving will be placed.

COW ISLAND BENDWAY WEIR CONTRACT: The work consists of furnishing all plans, labor, and materials by constructing Cow Island Bendway Weir Nos. 1-6 by placing Graded Stone A as well as incidental related work. Riprap Paving will be placed on the bank at each weir location. [Emphasis added]

5. The contract included Federal Acquisition Regulation (FAR) clause 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984), which provides (with revisions to accommodate the contract):

The Contractor shall be required to (a) commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than **75 calendar days for Friars Point project, **20 calendar days for Loosahatchie project, **20 calendar days for Robinson Crusoe project, and **50 calendar days for Cow Island project after the date of receipt by him of notice to proceed. A separate Notice to Proceed will be issued for each location as specified in the Bid Schedule. [Underlining added]

(R4, tab 3 at 68)

6. The following pertinent "CONSTRUCTION PROCEDURES" were set forth in section 35 31 25.00 11 of the specifications (R4, tab 3 at 267-69, 271-72):

PART 1 GENERAL

....

1.2    SCOPE

...The work shall be completed as expeditiously as possible even though river conditions may become increasingly severe as the construction progresses. The work requires steady and uninterrupted progress to

3

minimize loss of stone during construction. The Contractor shall diligently prosecute the work and provide the necessary equipment, a skilled and experienced crew, and a regular and well-balanced supply of stone to ensure uniform and continuous progress once construction of a chevron/dike/bendway weir has been started....

## 1.3    RIVER STAGE LIMITATIONS

### 1.3.1    River Stage Limitations for Dikes and Chevrons

Unless otherwise authorized by the Contracting Officer, subaqueous placement of stone will not be permitted when the river stage is more than 10 feet above the top elevation of that portion of the dike/chevron. Also, unless otherwise authorized or directed by the Contracting Officer, the top of the final lift of stone shall be placed in the dry whenever the dike/chevron is higher than +10 LWRP [2]and/or the crown width is 6 feet or more. Work will not be required on any dike/chevron when river stages are below 0 LWRP. Work will also not be required on a particular dike/chevron if a 6 foot continuous channel does not exist from the navigation channel to some work point on the dike/chevron where work is required.

### 1.3.2    River Stage Limitations for Bendway Weirs

Unless otherwise authorized by the Contracting Officer, subaqueous placement of stone will not be permitted on any weir when the river stages are above +20 LWRP. Work will also not be required on any weir if a 6-foot continuous channel does not exist from the navigation channel to some work point on the weir where work is required.

---

[2] LWRP stands for low water reference plane which is a tool used on the Mississippi River to establish navigation depths tied to certain gages on the river. All relevant work performed on this contract was tied to the Memphis gage. To determine LWRP using stage data at the Memphis gage a "correction factor" of -7.2 is used, i.e. + 7.2 is added to the Memphis gage reading to convert stage data to its corresponding LWRP. (Tr. 1/42-48)

4

....

## 1.5  ALIGNMENT CONTROL PLAN FOR CHEVRONS (FRIARS POINT AND LOOSAHATCHIE BAR)

Unless otherwise authorized or approved by the Contracting Officer, construction of the chevrons shall have an additional requirement for control of stone placement.  The contractor shall submit a Chevron Alignment Control Plan to the Contracting Officer for approval prior to placement of any stone.  The plan shall outline required horizontal and vertical control, the procedure, and equipment that will be used by the contractor for alignment control during the construction of the chevrons....

....

## 1.8  PROSECUTION OF WORK

After work has been started on a chevron/dike/bendway weir, the Contractor shall not suspend work until a lift of stone of full base width has been placed for the full length of the chevron/dike/bendway weir, or remove any equipment from this location, which in the opinion of the Contracting Officer, is required for orderly progress of the work.  This prohibition will not apply during any period when work is suspended due to river stages, weather, or other conditions outside the control of the Contractor.

## 1.9  ORDER OF WORK

The work shall be carried on in accordance with the (schedule) required by paragraph (a) of the Contract Clause "SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984)" located in Section 00700.

(1) Unless otherwise approved or directed by the Contracting Officer, the order of work shall be to begin construction at the landward limit of the proposed chevron/dike/bendway weir and procede [sic] riverward to the riverward limit of the proposed chevron/dike/bendway weir.  Construction shall begin

5

with the most downstream/chevron/dike/bendway weir and procede [sic] with the next chevron/dike/bendway weir....

(2) Concurrent construction will be permitted provided that sufficient equipment and stone supplies are available and it does not slow construction priority of the dikes/chevrons/weirs as listed in the "ORDER OF WORK," paragraph 1.9 (1), unless otherwise directed by the Contracting Officer....

....

## 3.2 LOOSAHATCHIE BAR DIKE NO. 4, ROBINSON CRUSOE DIKE NOS. 3, 4, AND 5, CHEVRON NO. 1, AND ROUNDPOINT NOS. 1 AND 2

Unless otherwise authorized or directed by the Contracting Officer, construction of the contract dikes, chevron, roundpoints, and environmental notches shall be performed in accordance with the following procedures:

### 3.2.1 Extending Dike

Prior to stone placement, a survey will be taken along the centerline of the existing dike for the riverward 300 feet of the dike as well as for the proposed extension. The survey shall consist of cross sections taken on 50-foot intervals extending 150 feet upstream and 150 feet downstream of the proposed dike extension. These sections may demonstrate the need for adjusting the stone placement to maximize use of the stone. If this survey does not reflect what has been given on the plans as the centerline profile for the proposed dike extension, the Contracting Officer and River Engineering must be immediately notified prior to any stone being placed.

(1) The stone for extending the dike shall be placed in lifts, each proceeding riverward from the landward limit of construction. Approximately 10 tons of stone per linear foot of dike shall first be placed for the entire length of the dike extension.

6

The stone shall be placed along the downstream toe of the full section except where it must be distributed within the base of the full section to prevent exceeding the specified thickness. The dike shall then be completed to full grade and section by placement of stone in horizontal layers of about 5-foot thickness. Each layer shall be carried the full length of the dike and low areas and gaps shall be brought up to the desired elevation before proceeding with the next lift....

### 3.2.2 Constructing Chevron

Prior to stone placement, a survey will be taken along the centerline of the proposed chevron. Each survey shall consist of a centerline profile being taken beginning 200 feet downstream of the landward leg of the chevron proceeding riverward along the proposed alignment to 200 feet downstream of the riverward leg of the proposed chevron....

(1) Construction of the chevron shall start at the center of the chevron, proceed to the riverward leg at the downstream limit of the chevron, and then proceed from the center to the landward leg at the downstream limit of the chevron. Unless otherwise authorized or directed by the Contracting Officer, the chevron shall be constructed in lifts. The base shall be placed in a lift of approximately 10 tons of stone per linear foot of chevron, or required quantity if less than 10 tons, for the full length of the chevron.

(2) The chevron shall then be completed to full grade and section, proceeding riverward from the center as specified above and then landward from the center, by placement of stone in the underwater portion of the chevron in approximately uniform horizontal layers of about 5-foot thickness and full width. Each lift shall be brought to the desired elevation before proceeding with the next lift.

7. Section 01 45 04.00 11, Contractor Quality Control, section 3.10 of the contract provided:

NOTIFICATION OF NONCOMPLIANCE

The Contracting Officer will notify the Contractor of any detected noncompliance with the foregoing requirements. The Contractor shall take immediate corrective action after receipt of such notice. Such notice, when delivered to the Contractor at the work site, shall be deemed sufficient for the purpose of notification. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to such stop orders shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.

(R4, tab 3 at 249)

8. The contract included FAR 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996), which provides:

(f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

(g) If the Contractor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the work and charge the cost to the Contractor or (2) terminate for default the Contractor's right to proceed.

(R4, tab 3 at 132)

9. The contract included FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), which provides in the contract:

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the

8

work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. [Emphasis added]

....

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

(R4, tab 3 at 142-43) The contract also included FAR clause 52.249-3, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (DISMANTLING, DEMOLITION, OR REMOVAL OF IMPROVEMENTS) (MAY 2004), which provides at paragraph (e) that "[a]fter termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer."

10. FAR 52.236-4, PHYSICAL DATA (APR 1984), stated in part (R4, tab 3 at 123):

d. Additional Data. Pertinent data of different local gages on the Mississippi River is indicated in the following tabulation:

| Gage | Mile (1962) | Zero of Gage Ft. NAVD88 | Record Low | LWRP* | Bankfull |
|------|------------|------------------------|-----------|-------|----------|
| .... | | | | | |
| Memphis, TN (Weather Bureau Gage) | 734.4 | 184.03 | -10.7 | -7.2 | 34 |

*Low Water Reference Plane (2007)

11. The Loosahatchie work consisted of (1) constructing, in the Mississippi River channel itself, an extension to Loosahatchie Dike No. 4; and (2) constructing, in the "Loosahatchie Chute" located on the other side of the Loosahatchie Bar from the Mississippi River (that is, the chute between the Loosahatchie Bar and Robinson Crusoe Island), a stone "Loosahatchie Bar Chevron" and two stone "Loosahatchie Bar RoundPoints" to the chevron (R4, tab 5 at 321-25; gov't br. at 10,¶ 9; app. br. at 7, ¶ 18). The contract estimated that the Loosahatchie work would require the placement of 32,250 tons of stone (R4, tab 3 at 44).

12. The Robinson Crusoe work consisted of (1) constructing, in the Mississippi River channel, extensions to Robinson Crusoe Dike No. 3, Robinson Crusoe Dike No. 4, and the Mississippi River channel portion of Robinson Crusoe Dike No. 5; and (2) excavating, in the Loosahatchie Chute, a navigable "notch" in the chute portion of Robinson Crusoe Dike No. 5 (R4, tab 5 at 321-25; gov't br. at 10, ¶ 10; app. br. at 12, ¶ 48). The contract estimated that the Robinson Crusoe work would require the placement of 27,400 tons of stone (R4, tab 3 at 44).

13. Although the Corps never issued notices to proceed with the Friars Point work or the Cow Island work (tr. 4/227; gov't br. at 10, ¶ 8), and Nelson never performed any of that work (*see* tr. 1/162), the contract estimated that 243,950 tons of stone would need to be placed to complete the Friars Point work, and that 190,700 tons of stone would need to be placed to complete the Cow Island work (R4, tab 3 at 43, 45).

14. Contract section 00800, Special Contract Requirements, contained the following provision at paragraph 1.2.2 (R4, tab 3 at 175):

> For the purpose of final acceptance, the work is divided into sections; namely, each chevron/dike/weir. Each chevron/dike/weir shall constitute a divisible part of the work. Final acceptance of each part will be made immediately after all work on each part has been completed in accordance with the requirements of this contract.

15. The contract as awarded on 31 July 2009 contained Drawing Nos. 9A and 10A, dated April 2009, for the Loosahatchie and Robinson Crusoe Mississippi River channel dike extensions, including depictions of the ground profiles as of March 2009 (R4, tab 5 at 322-23). In August 2009, the Corps issued Drawing Nos. 9B and 10B, regarding the dike extensions; according to Note Nos. 0001 to the drawings, the drawings "[a]dded control diagrams and adjusted profiles" (*id.* at 342, 343). In September 2009, the Corps issued Drawing Nos. 9C and 10C, regarding the dike extensions; according to Note Nos. 0002 to the drawings, the drawings "[a]djusted profiles and changed crown widths based on changed site conditions" (*id.* at 353, 355). Drawing Nos. 9C and 10C expanded the dike extension crown widths to 30 feet: from 14 feet for Robinson Crusoe Dike Nos. 3 and 4, and from 20 feet for Loosahatchie Dike No. 4 and Robinson Crusoe Dike No. 5 (R4, tab 5 at 342-43, 353, 355). The Corps issued Drawing Nos. 9C and 10C to account for sedimentation at the work site that Nelson had discovered upon surveying the site (tr. 2/33-36). The modified profile of the extension to Loosahatchie Dike No. 4 in Drawing No. 9C depicted a new "hump" not depicted in Drawing No. 9B; that is, an additional profile of existing ground (as of 22 September 2009) rising above a portion of the profile of the stone to be placed (R4, tab 5 at 353).

16. Nelson received the notice to proceed (NTP) with the Loosahatchie work on 1 October 2009 despite the lack of a Corps solution regarding the presence of the "hump" (R4, tab 34 at 800).

17. On 7 October 2009, the Corps emailed Drawing Nos. 9D and 10D, regarding the Loosahatchie and Robinson Crusoe dike extensions (app. supp. R4, tab 140 at 3342-44). The email explained that the drawing had "the corrected layout distances," that the Corps would "provide a full set by modification in the near future," and that "[t]hese should be used until such time" (*id.*). The email also explained that a "hard copy has been delivered to the site" (*id.*).

18. On 13 October 2009, the Corps again provided to Nelson Drawing Nos. 9D and 10D regarding the dike extensions, along with an unsigned bilateral contract Modification No. P00004 (Mod. 4) (app. supp. R4, tab 141 at 3356-61). Both the modification and its cover letter stated that the modification "serve[d] to replace existing contract drawings with revised contract drawings," and that "[t]he ground profiles, dike lengths and azimuths are adjusted to reflect the latest river conditions" (*id.* at 3356-57). Drawing Nos. 9D and 10D moved the "starting locations" of the dike extensions; that is, the point from which the extensions from the existing dikes would begin (*see* tr. 2/36-42). The Loosahatchie Dike No. 4 extension moved 85 feet toward the existing dike, resulting in a "total movement" of 1½ feet of the starting point of the extension (tr. 2/41-44). Like the cover letter and the modification, Note Nos. 0003 (dated 6 October 2009) to the drawings also stated that the drawings "[a]djusted profile, dike lengths & azimuths based on latest river conditions" (R4, tab 5 at 3360-61).

19. The versions of Drawing Nos. 9D provided to Nelson on 7 October 2009 and 13 October 2009 are not identical (app. supp. R4, tab 140 at 3343, tab 141 at 3360). The profile of the hump in the two drawings is different, and a note to the Loosahatchie Dike No. 4 profile found in the 13 October 2009 version but not in the 7 October 2009 version states:

> MINIMUM THICKNESS OF STONE IS 4 FEET.
> AREAS WHERE THE EXISTING GROUND IS ABOVE
> EL 154.9' SHALL BE ALLOWED TO SCOUR PRIOR
> TO STONE PLACEMENT.

(*Id.*)

20. There were no express changes to specification provisions regarding procedures for constructing the dike extension affected by the 13 October 2009 version of Drawing No. 9D. The Corps indicated that it intended by the above note (at times referred to herein as the "scour solution") that Nelson would begin work at:

[T]he landward limit and proceed[] riverward [b]ut at the point in time when [Nelson] reached areas where the existing ground had filled in above the design elevation of the structure, [Nelson] would have to place the stone to that point and then allow the river bed to scour that out below the design elevation to at least a four foot thickness [s]o that [Nelson] could then place a four foot thick minimum thickness of stone in that structure.

(Tr. 2/46-47)

21. During the period 2-13 October 2009, Nelson mobilized and worked on equipment issues, but placed no stone while it was awaiting resolution of the "hump" issue and experiencing low water stages that precluded floating its equipment and constructing structures in the chute (R4, tab 79 at 1022-33; app. combined R4, tab 3 at 27).

22. Also on 13 October 2009, the authorized representative of the contracting officer (COR) issued a letter to Nelson expressing concern with Nelson's progress, and requesting that Nelson submit "a work plan and a revised acceptable schedule to demonstrate how you will complete this work within the contractual period of performance given your progress thus far" (R4, tab 38 at 856).

23. On 14 October 2009, the Corps advised Nelson that rising water conditions in the river did not allow rock to be dropped at Loosahatchie Dike No. 4, and directed Nelson, on the same day, to move its equipment to the chute (R4, tab 79 at 1034).

24. Nelson primarily controlled when the NTPs for the other sites would be issued depending, *inter alia,* on river conditions, Nelson's equipment and crews, and scheduling needs (R4, tab 24). The parties agreed to issue the NTP for the Robinson Crusoe work on 15 October 2009 permitting appellant to maximize the work available in the chute (R4, tab 40 at 858). Also on 15 October 2009, Nelson placed its first stone of the contract work at Loosahatchie Roundpoint No. 1 in the chute (R4, tab 79 at 1035).

25. During the period 15-18 October 2009, Nelson excavated stone at the Robinson Crusoe notch (R4, tab 80 at 1178, 1181, 1183, 1185).

26. Between 16-18 October 2009, Nelson continued to work on the Roundpoints in the chute, completing Roundpoint No. 1 and placing approximately 731 tons of the approximately 881 tons of stone required for Round Point No. 2 (R4, tab 79 at 1036-38, tab 80 at 1185).

27. On 25-28 October 2009, Nelson placed stone on the Loosahatchie dike extension even though the river stages in the channel were below +20 LWRP on only two of the four days (R4, tab 79 at 1045-46, tab 80 at 1194, 1196, 1198).

12

28. On 28 October 2009, Nelson signed Mod. 4, bearing an effective date of 9 October 2009, regarding drawing revisions 9D and 10D and the "scour solution" for the "hump." The contracting officer (CO) signed the modification on 2 November 2009. (App. supp. R4, tab 141 at 3356-61) The modification contained a general release with no reservation of rights by Nelson to file a claim for an equitable adjustment related to the drawing revision. In explaining the reason no time extension or monetary adjustment was included, the COR concluded that, since no additional stone was required, the change did not affect Nelson's critical path (tr. 2/324; R4, tab 41).

29. On 29 October 2009, Nelson placed its first stone for the chevron (R4, tab 80 at 1202); the Corps provided its written approval of Nelson's chevron alignment plan on 30 October 2009 (app. supp. R4, tab 27 at 533). On 30 October 2009, Nelson placed no stone, because, Nelson decided, weather conditions were unfavorable (R4, tab 79 at 1054).

30. On 29 October 2009 through 2 November 2009, Nelson placed stone for the chevron (R4, tab 79 at 1052, 1055-63, tab 80 at 1209).

31. The COR, by letter dated October 27, reiterated the 26 October 2009 completion date calculation including four days of high river stages deemed excusable delay by the Corps. The COR reiterated that he was concerned with Nelson's quality control as well as Nelson's progress. The COR stated that a considerable amount of stone had been placed out of grade and section. (R4, tab 46)

32. During a meeting with Nelson on 2 November 2009, the Corps expressed concerns with Nelson's work such as "[n]ot a lot of rock in river," "[w]hat is going in is not in section," and "[s]tone in dike extension in channel is out of section 30-40 feet" (R4, tab 48 at 869). Nelson indicated that it would hire additional survey crews and placement crews. The COR also stated that Nelson's quality control was lacking. Nelson claimed that the stone was only 5% out of section, and that the "C" stone was moving, and that the heavier "A" stone should be utilized for the Loosahatchie. The Corps and Nelson agreed that Nelson would have until the next day 3 November 2009 to submit a plan for further performance. The CO advised Nelson that failure to submit an acceptable plan would result in the issuance of a show cause letter and that Nelson would have 10 days from the day of receipt to show cause why the contract should not be terminated for default. (R4, tab 47 at 868)

33. Nelson, by letter dated 3 November 2009, requested clarification regarding the interpretation of the river stage limitation for the extensions to Loosahatchie Dike No. 4, and the Robinson Crusoe Dikes (R4, tab 50).

34. On 3 and 4 November 2009, Nelson placed stone for the chevron (R4, tab 80 at 1217, 1220).

35. On 5 November 2009, the Corps directed Nelson to stop work until further notice, because of high water (R4, tab 79 at 1065).

36. Also on 5 November 2009, the COR notified Nelson that section 35 31 25.00 11, paragraph 1.3.1, did not relate to the low water extensions to the dikes. The letter stated that the limitations related to those features of work (Loosahatchie and Robinson Crusoe) were set forth in paragraph 1.3.2, and that provision permitted stone placement below a +20 LWRP (12.8 on the Memphis gage). (R4, tab 51)

37. On 6 November 2009, CO Priscilla Sweeney, by telephone, also orally ordered Nelson to stop work, for perceived performance deficiencies (R4, tab 53 at 877 (reference b); tr. 6/155-56).

38. On 9 November 2009, CO Sweeney issued a written "Stop-Work Order" (SWO) that referenced the Notification of Noncompliance clause, directing that Nelson "stop all work pursuant to the above reference[d] contract," and identifying areas of specific, alleged contract noncompliance, including with respect to the construction aspects of the Loosahatchie work (R4, tab 53 at 877-78). The order identified specific examples, including:

> Loosahatchie Dike and Chevron Construction. The Dike extension & Chevron are not being constructed as directed in the specifications; the entire length of the Chevron is to be based in at 10 tons/ft, then constructed in uniform horizontal layers of about 5' thickness and full width. Each lift is to be brought to the desired elevation before proceeding to the next lift. This is outlined in Section 35 31 25.00 11 paragraph 3.2.2. of the contract. Survey indicates that stone has been placed outside of the design section on both Loosahatchie Dike No. 4 and Chevron No. 1. Rock placement of Loosahatchie Dike No. 4 has been placed 35 to 40 feet downstream of the designed centerline, with peak sections above the given tolerance that will become a hazard to navigation during low river stages.

(R4, tab 53 at 877)

39. The SWO further stated:

> Execution. Thus far Nelson, Inc. has not demonstrated the ability to execute the work in the manner prescribed in the specifications. The work requires steady and uninterrupted progress to minimize loss of stone during construction. Each dike extension, Chevron and weir is to be based in at

14

10 ton/lf, then constructed in uniform horizontal layers of about 5 ft thickness for full width, the gaps and low areas are to be brought up to the desired elevation before proceeding with the next lift. Nelson has not complied with the above requirement. The work Nelson has executed outside the navigation channel (specifically the Chevron) is not acceptable and the work executed inside the navigation channel (Loosahatchie Dike No. 4 extension) poses a hazard to navigation during low river stages. Nelson's cross-sections for Loosahatchie Dike No. 4 extension that show the stone is not only downstream of the design centerline but also shows the peaked sections.

(R4, tab 53 at 878) The order did not identify any noncompliant Robinson Crusoe work.

40. The SWO stated that "this stop-work order will remain in effect until immediate corrective actions are approved," and that "[n]o further work shall be performed until such time as to the approval of corrective action" (R4, tab 53 at 877).

41. The SWO also informed Nelson that a plan that Nelson had submitted on 3 November 2009 "has been deemed insufficient as it did not demonstrate any ability to perform this work with personnel...that has experience in dike/chevron construction built with river currents the same or similar to the Mississippi River" (R4, tab 53 at 878).

42. Also on 9 November 2009, CO Sweeney issued a notice to Nelson ordering it to show cause why the contract should not be terminated, including for "failure to execute [the Loosahatchie] work within the performance period" (R4, tab 53 at 875-76).

43. On 12 November, Nelson claimed that it considered the COR's interpretation of the river limitation placement for the extensions to the Loosahatchie and Robinson Crusoe dikes a change order. Nelson also claimed it would seek an "equitable adjustment to accommodate increased costs for procuring additional 'C' stone as necessary to meet contract requirements and offset the volume that has and/or may drift out of sector [section] during placement in the main channel under the 'new' maximum allowable river stage."

44. On 16 November 2009, the COR, by letter responded in part:

According to the contract records to date, there has been no indication of defective specifications or any misunderstanding among your staff in the field or on the part of the Government's representative as to workable river stages for these sites. You held a preparatory to begin this work on October 5, 2009 and only now have you

15

issued a letter to the Government claiming defective specifications as of November 12, 2009. Serial letter C-0014 clarified questions concerning your letter H-0004 river stage limitations. Therefore, I do not consider it to be a change to this contract....

...The failure of your company to properly plan, prosecute, and control the placement of "C" stone as prescribed in the plans and specifications have ultimately lead to this outcome. Therefore, your request for an equitable adjustment under Section 00700 52.243-4, paragraph (e) is denied.

(R4, tab 61)

45. Nelson submitted its response to the CO's show cause notice by letter dated 17 November 2009 (R4, tab 63). Nelson alleged that several circumstances had arisen that "will" influence how completion of the remainder of the Loosahatchie features will proceed. Nelson maintained that the +20 LWRP stone placement limitation for the dikes represented an unauthorized change by the COR, and that such a change would require dropping stone in much deeper water. Nelson requested "that the contract performance period be suspended; *until such time that river conditions allow us to access and resume work* on Loosahatchie Dike #4 in accordance with the applicable contract documents." Nelson presented to the Corps a proposal for the resumption of work, with additions to its "equipment and manpower onsite," including a foreman with significant stone placement experience. (*Id.* at 918, 922) (Emphasis added)

46. At a 2 December 2009 meeting, appellant described the measures it would take to expedite the work including more experienced personnel and subcontractors. There is some evidence that "the Corps" orally gave Nelson permission to resume work, but only to "correct work" that the Corps had determined needed correction. The scope and author of the oral authorization are not clear. Nor was the alleged authorization followed up or confirmed in writing by either CO. (Tr. 7/152-53; R4, tab 66 at 928, tab 67 at 930) There is no persuasive evidence that the Corps officially and formally retracted the requirement in the notification of non-compliance and SWO that appellant was to present and obtain approval of a corrective action plan. The Corps required that no later than 9 December 2009 Nelson was "to present a detailed plan on the entire job, & that the Corps will have 1 week to review and make a decision on whether or not to terminate for default." (R4, tab 66 at 928)

47. At the meeting, appellant again alleged that the Corps interpretation regarding the +20 LWRP placement limitation for the underwater extension to Loosahatchie Dike No. 4, was an unauthorized change to the contract. The COR noted that if Nelson's interpretation was that it had to wait until the river elevation was 10 feet or less (above

16

the top of the underwater dike extension) before placement could begin, then the structure would never be built, since that elevation condition would be lower than the record low at the Memphis gage. The COR noted that the +20 LWRP placement was not an issue during the preconstruction conference on 10 September 2009, nor was it an issue during the preparatory phase discussion in October. (*Id.*; tr. 1/120; R4, tab 93)

48. On 8 December 2009, Nelson submitted to the Corps a "Revised Work Plan" (R4, tab 67 at 929). Nelson estimated that it would take two days to perform corrective Loosahatchie work (not including surveys), and conceded that at least some of that work required remediation because of Nelson's performance (*id.* at 930-31).

49. Nelson estimated that it would take an additional 10 days otherwise to complete the Loosahatchie and Robinson Crusoe work, once the suspension of work was lifted: 3 days to complete the Loosahatchie work in the chute, and 7 days to complete the Loosahatchie and Robinson Crusoe work in the river (R4, tab 67 at 931, 934, 940). Finally, Nelson anticipated that it could place 4,800 tons of stone per day, and that it could complete the Cow Island work in 50 days, and the Friars Point work in 75 days (*id.* at 936, 938), the same periods provided in the contract (R4, tab 3 at 68).

50. The oral partial lifting of the SWO, was discussed in the 8 December 2009 letter to CO Sweeney from Nelson with the following preamble:

> **Remedial Repair Construction Operations**. Based on the November 6, 2009 verbal stop work order and per the Corps of Engineers written Stop Work Order dated November 9, 2009 along with high river stages, Nelson could not perform remedial operations. Based on the work authorized by Ms. Todd in our December 2, 2009 meeting, Nelson has mobilized its 800 Volvo excavator to take immediate corrective action subject to appropriate river stages....

(R4, tab 67 at 930-31)

51. On 11 December 2009, the Corps informed Nelson that it would respond to the revised work plan by 15 December 2009 (R4, tab 68 at 961, 965). In the letter, CO Sweeney made no mention of appellant's performance of remedial work and noted that the "initial corrective action plan submitted by Nelson was lacking in detail and unacceptable" and further noted that [the 8 December 2009 corrective action plan] "was currently under technical review" (R4, tab 68 at 964-65). No Corps response was provided until 8 January 2010 (R4, tab 71)

52. On 23 December 2009, the Corps' area engineer specifically informed both COs Sweeney and Todd, in the same email, that "Nelson has intentions to remobilize next week to begin repair" (R4, tab 70).

17

53. On 8 January 2010, the Corps rejected Nelson's revised work plan, finding that the plan lacked "experienced personnel capable of performing work on the Mississippi River" (R4, tab 71 at 974). The record is unclear when Nelson was notified that its revised work plan had been rejected.

54. Pertinent river stage data for the period 13 October through 6 November 2009 when the SWO was orally issued indicates that the river stage in the channel fell below +20 LWRP on only three days from 24-26 October 2009. Between 6 November 2009 and the 8 January 2010 date of the government's rejection of Nelson's response to the show cause notice, the river stage in the channel fell below +20 LWRP for only nine days (from 30 November through 8 December 2009). Between 13 October 2009 through the date of termination on 5 February 2010, the river stages ranged above 22.8 LWRP into the mid to upper 30s for most of that period. On only 26 days during that approximately 108-day period did river stages sporadically drop below 20.4 and it was not until 30 November 2009 that the river stages were consistently below 20.4 for more than a four day stretch. There were also a number of days prior to issuance of the SWO where the stages did not permit work on structures in the chute. (App. combined R4, tab 3 at 27-29)

55. On 9 January 2010, Nelson resumed work at the chevron (R4, tab 79 at 1133, tab 80 at 1296). There is no indication in the daily reports that Nelson performed any on-site work at any location after 9 January 2010 (R4, tab 79 at 1135-50, tab 80 at 1298-1315). Nelson's quality control report for 9 January 2010 records that due to "river conditions" and other issues, Nelson "is waiting until the river gage falls below the recommended depth by [the Corps] so Nelson Inc. can get back on the river *to continue the repair process* and restart the contract" (R4, tab 79 at 1133) (emphasis added). Specifically, the quality control report records that Nelson performed work on a mound in the chute, but does not record any work performed on the mound in the main channel that Nelson identified in its 2 December 2009 letter (*id.*; R4, tab 67 at 931). In addition, the quality control report records that "[s]urvey as builts are to be taken to determine the amount and where the rock is now located" (R4, tab 79 at 1133).

56. On 7 January 2010, the ACO/COR issued a draft Modification No. P00006 (Mod. 6) granting appellant a nine-day time extension for the Robinson Crusoe site "for high channel stages occurring during the period October 16, 2009 through November 12, 2009" extending the site's completion date to 13 November (R4, tab 70A). However, the Memphis gage data indicates that river stages exceeded +20 LWRP on all except three days during that period (app. combined R4, tab 3 at 27-28).

57. On 13 January 2010, Nelson wrote to the Corps that Nelson had "leveled out the improperly placed lifts of stone" at the chevron, but that "[b]ecause the [water level] continues to fall, we were not able to perform our as-built progress survey from the water" (R4, tab 74 at 979). Nelson wrote that it would "complete this work within a week of suitable dry conditions along the feature" (*id.*). Nelson also explained that:

As referenced in our revised Work Plan submitted on December 8, 2009, DIMCO surveyed the vicinity downstream of the Loosahatchie Dike No. 4.... These confirmed the presence of stone 35' to 40' downstream of the proposed center line at Station 4+50. *The survey also showed that sedimentation on the proposed feature that was previously identified in pre-construction surveys has continued to occur and enlarge downstream to the vicinity of this out-of-sector stone.* Nelson Incorporated remains prepared to knock down the stone as indicated in our revise[d] Work Plan but requests that the Corps of Engineers confirm that this is the appropriate action *given the ongoing sedimentation.* [Emphasis added]

(*Id.*) There is no record of the Corps responding to Nelson's request for such confirmation and providing directions regarding the ongoing "hump" issue. To the very limited extent Nelson may have attempted to perform corrective work without formal authorization, it was concerned whether the SWO took precedence over the contract provision requiring prompt correction under threat of termination (R4, tab 31 at 378-79).

58. On 22 January 2010, Nelson again wrote to the Corps requesting the lifting of the SWO (R4, tab 75 at 983).

59. On 20 January 2010, the CO requested the necessary reviews required by Corps procedures preparatory to terminating the contract for default in cases where a COC has been issued by the SBA. On 1 February 2010, CO Todd's termination for default determination was approved. (R4, tab 76 at 994-96)

60. On 9 February 2010, CO Todd terminated the contract for default, for "failure to perform the required work in a timely and acceptable manner" (R4, tab 77 at 997-98). Among CO Todd's findings were that (1) "Nelson has failed to perform according to the approved schedule," (2) the Loosahatchie work was "5% complete and had a completion date of October 25, 2009," and (3) the Robinson Crusoe work was "2% complete and had a completion date of November 8, 2009" (*id.*).

61. On 14 April 2010, Nelson timely appealed the 9 February 2010 termination. The appeal was docketed ASBCA No. 57201.

19

## DECISION

The contract included FAR 52.249-10, Default (Fixed-Price Construction) (Apr 1984), which provides, in part, as follows:

> (a)  If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion *within the time specified in this contract* including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.  [Emphasis added]

The government has the burden of proving that the termination for default was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed. Cir. 1987). *Discount Co. v. United States*, 554 F.2d 435, 441, *cert. denied*, 434 U.S. 938 (1977), interprets the clause to require the government to demonstrate a "lack of diligence such that the government [cannot] be assured of *timely completion*" (emphasis added).  In *Lisbon Contractors,* 828 F.2d at 765, the Federal Circuit construed the clause to require "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort *within the time remaining for contract performance*'" (emphasis added); *see also RFI Shield-Rooms*, ASBCA Nos. 17374, 17991, 77-2 BCA ¶ 12,714 at 61,732.

We conclude that the Friars Point, Cow Island and the combined Loosahatchie and Robinson Crusoe sites were "separable" parts of the contract for purposes of applying the Default clause and determining the propriety of the termination.  Applying the above criteria, we further decide that the termination was improper as to all of the sites.

## I.  Severability

### A.  General Conclusions

The contract's termination for default clause only allowed the Corps to terminate "the right to proceed with the work (or the separable part of the work) that has been delayed."  Where a contract is separable (sometimes also referred to as severable, or divisible) and a contractor is delinquent only as to a separable part of the contract work, it is improper for the contracting officer to terminate for default the entire contract. *Overhead Electric Co.*, ASBCA No. 25656, 85-2 BCA ¶ 18,026 at 90,471-72; *see Technocratica*, ASBCA No. 44134 *et al.*, 94-2 BCA ¶ 26,606 at 132,370; *see also Bulova Technologies Ordnance Systems LLC,* ASBCA No. 57406, 14-1 BCA ¶ 35,521 at 174,098-99, *aff'd on recon.*,14-1 BCA ¶ 35,802 (and cases cited) (supply contract); *see*

20

*generally* CIBINIC, NASH & NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS at 904-06 (4th ed.). In this case, the discrete, "separable" nature of the work required at the sites generally is emphasized by the fact that separate NTPs and performance periods were prescribed for each site. The pricing structure and schedule reinforce the "separable" nature of the sites as does the "Project Description" of each site as a separate "contract." Each of the four site locations was priced separately and "[e]ach chevron/dike/weir" was expressly deemed "divisible" and could be accepted and paid for separately immediately following its completion at any of the sites (R4, tab 3 at 175). Commencement of work at each site was not dependent on, or related to, completion of the work at the other locations. Work at each of the locations did not involve sequential or incremental and interdependent progression of construction, e.g., of one building or levee at one contiguous site.

We also consider that, on the unusual facts of this case, the Loosahatchie and Robinson Crusoe portions of the work together should properly be considered one discrete, "separable" part of the contract for purposes of the Default clause. The Loosahatchie and Robinson Crusoe work were adjacent to each other and closely-related in that both required construction in the chute between the bar and the island and closely proximate dike extensions in the river. The "Construction Procedures" portion of the specifications at ¶ 3.2 and pertinent drawing grouped the Loosahatchie and Robinson Crusoe together for purposes of describing and accomplishing the work at both sites. As the overall contract was administered and performed, work at the sites became linked and intertwined. NTPs for the Loosahatchie and Robinson Crusoe overlapped and were issued only 15 days apart to permit Nelson to begin excavation of the notch in the chute given the high stages in the river channel. Nelson could plan to perform the adjacent Robinson Crusoe excavation work relatively seamlessly without extensive movement of its barges, equipment and crews as conditions in the chute and channel permitted. The NTPs evidence the parties' contemporaneous decision to treat the Loosahatchie and Robinson Crusoe together as a divisible part of the contract for practical reasons. Accordingly, we consider that the Loosahatchie and Robinson Crusoe work were so closely connected that they jointly should be treated as a separable part of the work.[3]

On the other hand, the Cow Island (in Arkansas) and Friars Point (in Mississippi) locations were approximately 23 and 85 miles distant, respectively from the Loosahatchie and Robinson Crusoe site (in Tennessee). The work at each of former sites was covered by separate drawings and specification provisions. Issuance of separate NTPs were contemplated, with each of the latter, separately-priced sites requiring performance of substantially greater stone placement work. In short, there were separate NTPs, performance periods, site locations (each identified as a "contract"), pricing, and

---

[3] Although we consider it more accurate to treat Loosahatchie and Robinson Crusoe together jointly as one site for the reasons stated, the multiple bases for our conclusion that the termination for default was improper would apply equally if we were to analyze the propriety of the default for each site separately.

21

independent, self-contained work at each site as described in separate specifications and drawings.

Because parts of the contract were separable, the Default clause only authorized termination of appellant's right to proceed in the present case to the extent Nelson failed diligently to prosecute the inexcusably-delayed, separable parts of the work. *See* FAR 52.249-10(a); *Overhead Electric*, 85-2 BCA ¶ 18,026 at 90,472; *see also Murphy v. United States*, 164 Ct. Cl. 332, 334, 337 (1964).

> B. Distinguishing Issues Relating to the Computation of Performance Period and "Forfeiture"

Our corollary conclusion is that the times for completion at each of the locations were discrete. In this regard we disagree with the concurring opinion that appellant had 165 days to complete all four locations from the date of issuance of the first NTP for Loosahatchie. The NTP structure afforded the parties flexibility to accommodate scheduling issues, disruptions and river stages and conditions at the locations of work at each separate "contract" site. Moreover, there were no restrictions on the issuance of the NTPs. Theoretically the NTPs could have been issued concurrently, consecutively, or with overlap (as in the case of the Robinson Crusoe NTP which was issued during the performance period for the work at Loosahatchie).

The details of computing the periods of performance for each site are one factor, albeit a highly significant one, relevant to the broader issue of whether the sites were severable. However, those details are unusual, if not unique, and central to determination of the propriety of the termination. Read reasonably as a whole, we agree that the contract granted appellant a total of 165 days to complete the work at all four sites. We further consider that, where issued NTPs overlapped as in the case of Loosahatchie and Robinson Crusoe, appellant was entitled to the full allotted time granted to complete the structures for each site, plus any appropriate time extensions. We consider that it was not intended that the contract would deprive appellant of the full performance period at each site if NTPs were issued concurrently or overlapped. We also consider that the general intent of the contract was to issue the NTPs consecutively after consultation and cooperation between the parties and consideration of river stages and site availability/access issues. The overlap occurred here to permit the contractor to make the most productive use of its time in the chute as possible given adverse conditions in the channel. Accordingly, in the case of overlapping NTPs and their purpose in this case, appellant was entitled to 40 days to complete all work at Loosahatchie and Robinson Crusoe no later than 26 days after 15 October 2009, plus appropriate time extensions. In other words, the time remaining for completion of the Loosahatchie work (6 days) and the time afforded for completion of the Robinson Crusoe work (20 days) was 16 November 2009, including the four day weather extension granted in Modification No. P00005 (Mod. 5), plus any additional appropriate time extensions as discussed below. The Corps further concedes that the Robinson Crusoe

22

work was excusably delayed by nine days as a result of high river stages, extending the completion date for the combined site to 25 November 2009.[4] Because appellant commenced excavation of the notch at Robinson Crusoe during the Loosahatchie performance period, it would be improper in our view to conclude that the time for completion of the structures at the latter site should not be extended. Instead we compute the completion date in the same manner as if the NTP had been issued consecutively. To that extent, we agree with the concurring opinion that Nelson was entitled to "165 days" in total to complete all work at all sites. However, we part company with that opinion on the details and mechanics of calculating commencement and completion date(s) for the discrete sites individually.

As emphasized above, it is essential to examine and assess the nature of, and rationale for, the default in the context of the time for performance. *Cf. Technocratica*, 94-2 BCA ¶ 26,606 at 132,670. Fundamentally, we disagree with the concurring opinion's proposed methodology for computing a total performance period and evaluating the propriety of the default based on that period. The concurring opinion "backs into" its conclusion that we need not address severability. In doing so it postulates a faulty analytical framework. The principle distinctive and unique feature of this contract and appeal is that the separable portions of the contract have their own mandated performance period commencing with issuance of the NTP for the discrete sites.

The concurring opinion agrees that the applicable legal standards for resolving this dispute relate to an alleged failure to make progress and that resolution of these appeals requires that we first determine the completion date(s) for the project. The concurring opinion considers that Nelson had a single, 165-day period to complete all work under the contract ostensibly from the time of Nelson's receipt of the Loosahatchie NTP plus any time extensions for excusable delays, regardless of whether NTPs had been issued for the other sites. In essence it adds the performance periods for all four sites. Because, in the view of the concurring judge, the contract was terminated long before expiration of any reasonable date for completion using its 165-day criterion, the concurring opinion concludes that the default was improper for all sites. According to that opinion there is no need to focus our inquiry on the progress of the work, details of performance or excusability of the delays at Loosahatchie/Robinson Crusoe.

We believe that view, *inter alia,* oversimplifies, misreads and misapplies the time periods for completion of the work at each site. For all reasons discussed above, we

---

[4] We cannot determine the precise days for which the nine-day time extensions for high river stages were granted and whether they overlap with the four days previously granted for Loosahatchie. Because we consider that the time extensions failed to fully consider the high river stages as discussed later herein, it is not necessary to precisely determine the days conceded by the government's 9 January 2010 draft modification.

23

disagree that appellant had a single, 165-day period from the Loosahatchie NTP to complete all work. We consider that the concurring opinion misinterprets the NTP provisions, completion dates and fails to scrupulously apply other contract terms and their intent. It sets up incorrect criteria for evaluating the propriety of the termination. Therefore, that opinion's resulting conclusion that we need not address severability is founded on untenable premises. The unique manner in which this contract was structured requires a narrower, individualized approach to assessing the validity of the termination at each site. The fact that ultimately no "forfeiture" occurs follows and flows from our assessment that the default termination of each site was improper. The dissent also follows a similar approach in concluding that only the Loosahatchie/Robinson Crusoe site was in default while severing Cow Island and Friars Points as separable parts of the contract to prevent "forfeiture."

## II. Propriety of the Terminations

Because we consider the sites to be severable, the propriety of their termination requires discrete analysis.

### Friars Point and Cow Island

The termination of the Friars Point and Cow Island sites was improper. No separate NTP was issued for either of those discrete sites. Consequently, the time for performance of the work at those sites never commenced and there was no completion date or "delay" in performance at either site. Without a start and completion date, there is no yardstick to measure whether Nelson failed to diligently prosecute the work at those separable sites.

### Loosahatchie and Robinson Crusoe

The Corps termination decision failed to consider the separable nature of the sites, miscalculated the time for completion of the work at Loosahatchie and Robinson Crusoe and failed to grant time extensions due appellant. It is difficult to determine whether the basis for the termination was for failure to timely complete or failure to diligently prosecute the work so as to ensure its timely completion. The CO final decision considers that the performance period "expired" on 26 October 2009 (for Loosahatchie) after addition of the four days in Mod. 5 for high river stages. Many of the contentions in the government briefs also focus on a failure to timely complete analysis. As noted above, the more accurate time for completion was 25 November 2009 given the overlapping NTPs and without consideration of additional time extensions due appellant as discussed below. Thus, the propriety of the termination is dependent on whether Nelson inexcusably failed to diligently prosecute the work at the Loosahatchie and Robinson Crusoe site. The Corps misperception of the proper due dates for completion of the Loosahatchie and Robinson Crusoe sites contributed to its misanalysis of whether Nelson had a reasonable chance to timely complete that separable portion of the work. Moreover, the issuance of the SWO on

6 November 2006 prior to the completion date requires that we analyze whether the termination was justified for failure to diligently prosecute the work since the SWO was never effectively lifted and precluded any further progress after that date. Accordingly, we apply the *Lisbon* test noted above and analyze whether there was no "reasonable likelihood" that appellant could timely complete the Loosahatchie and Robinson Crusoe. We consider that the default termination was precipitate and unjustified applying that standard. There are several reasons that collectively, as well as individually, compel that conclusion.

First, Nelson was entitled to additional time extensions as a result of adverse river stages. Nelson was effectively deprived as a result of the adverse stages of working access to structures in the river where the majority of stone was to be placed. Low water conditions permitting work in the chute were also unpredictable and often concurrent with high stages in the channel. The government also failed to consistently administer the contract and grant appropriate time extensions even applying the Corps' own unreasonable interpretation of river stage limitations on the stone placement work. Equally unreasonable and inconsistent were government criticisms of appellant's failure to perform corrective work in adverse river stage conditions.

Second, appellant was entitled to additional time extensions as a result of the "hump" issue. The Corps took longer than the entire original performance period for the Loosahatchie site to develop and provide appellant with a solution. The Corps also failed to establish that it was practicable or even possible to start or perform the Loosahatchie dike extension work in the river channel in the manner prescribed by the specifications without that solution. Moreover, the Corps' "scour solution" for the "hump" was ineffectual for four months through the date of termination making it impossible to complete the Loosahatchie dike extension absent an alternative solution.

Third, the parties' discussions regarding any plan for any "corrective work" that may have been permitted by the SWO were subsumed within the broader discussion of appellant's proposals in response to the "show cause" letter that was issued on the same date as the written SWO. Moreover, the Corps never definitively or timely responded in writing to appellant's proposals until 8 January 2010. Nor in our view did the government ever clearly and effectively lift the SWO giving Nelson unambiguous guidance as to the scope of any corrective actions authorized much less permitting appellant to prosecute the work. At no time was either a specific corrective action plan or a general overall plan to correct deficiencies formally approved. To the very limited extent Nelson may have attempted to perform corrective work without formal authorization, it was concerned whether the SWO took precedence over the contract provision requiring prompt correction under threat of termination. Finally, given the continuing adverse river stages prevalent throughout the pre-termination period, the feasibility of performing even corrective work was highly questionable at best.

25

In reaching these conclusions and in determining that the termination was improper, we have fully and carefully considered the evidence relating to appellant's equipment, quality control, and stone placement problems. We do not consider Nelson's problems and deficiencies in its performance outweigh the other factors mentioned above and detailed below. Those factors justify our conclusion that there was a reasonable chance that appellant could have timely completed the Loosahatchie and Robinson Crusoe structures, particularly if Nelson's offers to augment its crews and equipment had been seriously considered and accepted by the government. For the numerous reasons discussed below we also reject the Corps' estimates of stone placement rates. Given the totality of the circumstances and countervailing factors detailed herein, the termination was improper.

A. The Impact of High River Stages on Prosecution of the Work

Critical and overarching factors in this case are that river stages did not permit performance of substantial, sustained and orderly work, in particular on the dikes in the channel at both sites. The Corps position focuses primarily on alleged inadequacies of the work in the chute. Although that work was significant, the bulk of the project at Loosahatchie and Robinson Crusoe involved construction of dike extensions in the river channel.

The government refers to a project critical path without offering any persuasive, viable, common sense analysis of the short performance period and delaying events impacting completion of the Loosahatchie and Robinson Crusoe structures. The fact that Nelson could perform some work in the chute, does not dictate a conclusion that time extensions were not appropriate for days that Nelson could not work in the channel. At some point, the critical path ran through the majority of the work in the river not the minority of the work in the chute. Essentially, Nelson did not have effective working access to the portion of the site where the majority of the work was to be performed. In addition, it was deprived of the opportunity to work simultaneously in both locations to expedite completion. Moreover, the Corps does not dispute that low water stages prevented work in the chute during the period 2 October 2009 through 13 October 2009, making the extension of Loosahatchie Dike No. 4 the only work available to Nelson during that period.

Regardless of issues with work performed in the chute, an enforceable completion date was never established that also fully considered the continuing "hump" issue and river stages. The river stage chart indicates that appellant was entitled to major time extensions. It could not work in the river and place stone for the critical dike extensions at the Loosahatchie and Robinson Crusoe sites in the manner contemplated and required by the specifications. Evaluation of whether Nelson had a reasonable chance of completing the entirety of the work at Loosahatchie and Robinson Crusoe required analysis not just of performance in the chute but time extensions due appellant as a consequence of the inability to work in the river. Compounding the government's misperception of the time

26

for completion was its failure to timely grant time extensions and its insistence that Nelson complete the work even though river stages exceeded +20 LWRP as detailed below.

### 1. The Parties' Unreasonable Interpretations of the Stone Placement Limitations

The parties' have differing interpretations of the restrictions on stone placement in the river set forth in Parts 1.3.1 and 1.3.2 of the "Construction Procedures" section of the specifications. The interpretations of those paragraphs by both parties are unreasonable.

The government alleges that part 1.3.2 governs whether the river stages permitted stone placement. That paragraph is entitled "River Stage Limitations for Bendway Weirs" and provides in pertinent part that "subaqueous placement of stone will not be permitted on any weir when the river stages are above +20 LWRP." The patent problem with this interpretation is that the "dike" extensions for Loosahatchie and Robinson Crusoe were not labeled "weirs." Parts 1.3.1 and 1.3.2 clearly distinguished between the two with part 1.3.1 entitled "River Stage Limitations for Dikes and Chevrons." The government's contention essentially ignores that obvious dichotomy and contradistinction and contradicts the plain meaning of the juxtaposed terms. Although Bendway Weirs were discussed in connection with the Friars Point and Cow Island work, the Loosahatchie and Robinson Crusoe structures in the channel were denominated and discussed as "dike" extensions. The government contends that appellant should have known, based substantially on their shape, that the "dikes" were in fact "weirs." More to the point, the government drafters of the specifications should have made clear that no distinction was intended.

Appellant interprets the more cryptic and latently ambiguous provisions of part 1.3.1 equally unreasonably. Its interpretation that -10 LWRP was the maximum placement level fails to recognize that the -10 LWRP level is 6.5 feet below the all-time low water level on the Mississippi River as measured at the Memphis gage. Although part 1.3.1 does address the dike extensions in the river, we agree with the government that appellant's interpretation results in the untenable conclusion that the dike work could only be performed when river stages were below the lowest historical stage on record. Appellant has failed to provide a reasonable interpretation that takes into consideration historical stages of the river.

Neither party has posited any alternative reasonable interpretation of part 1.3.1. We need not focus further on that issue in the context of evaluating the propriety of the termination given the government's failure to consistently apply its own +20 LWRP interpretation, as detailed below. Moreover and at the very least, the depth limitations on stone placement were confusing. Depth limitations were dependent on not only the river stages but the height of the structure. In that regard, part 1.3.1 prohibited "subaqueous placement of stone...when the river stage is more than 10 feet above the top elevation of that portion of the dike/chevron," unless authorized. It is unclear whether the prohibition applied to the height of the work in progress or the completed structure. In light of these

27

ambiguities and the general complexity of marshaling the daily factors at play influencing and limiting stone placement, we consider that Nelson was reasonably confused. As a minimum, the terms warranted government clarification and guidance if not a directed change to the contract requiring placement in the channel at stages below +20 LWRP in accordance with the Corps interpretation. Irrespective of whether Nelson had a reasonable interpretation of pertinent contractual provisions relating to the interplay of channel and chute conditions and prosecution of the work, it raised a reasonable question. Under the circumstances, it was improper to terminate appellant without first clarifying the matter and providing appellant an appropriate time extension from the government that fully recognized the conditions exceeding +20 LWRP prevalent throughout the pre-termination period. Until such action was taken, we consider that appellant did not have working access to the entire site during most of the performance period of this contract. Even if it could have placed stone on a few days, any placement operation could not be conducted in the manner required by the specifications. The government should have considered these factors, responded constructively to appellant's questions and considered the reasonableness of the inquiries. Even if Nelson was not correct in its interpretation, neither was the government

### 2. Inconsistent Corps Determination of the Excusability of Delays Associated with High River Stages

The government not only interpreted the limitations on stone placement in the channel unreasonably it also failed to consistently apply that interpretation in administering the contract and evaluating the excusability of delays. If the government's interpretation had been uniformly applied, appellant would have been entitled to extensive time extensions as a result of the prevalent high river stages because it was effectively deprived of working access to the considerable majority of the work at the Loosahatchie and Robinson Crusoe site.

Mod. 5 only granted time extensions for the four-day period 19 through 22 October 2015. River stage data from the pertinent Memphis gage for the period 13 October through 6 November 2009 when the SWO was issued indicates that the river stage in the channel fell below +20 LWRP on only three days 24-26 October 2009. Between 6 November 2009 and the 8 January 2010 date of the government's rejection of Nelson's response to the show cause notice, the river stage in the channel fell below +20 LWRP for only nine days (from 30 November through 8 December 2009). Yet there is no indication that the Corps considered the extent of the high river stages in evaluating Nelson's progress, much less did it grant appropriate time extensions associated with river stages. The high stages also impacted the sequencing of appellant's work. The Corps even expressly directed appellant to move to the chute on 14 October 2015. Considering the predominance of the high river stages after 13 October 2009 and unpredictable, fluctuating conditions in the chute, moving back and forth from the chute to the channel was more costly, time consuming and generally impracticable.

The granting of time extensions in Mod. 5 for high river stages support a conclusion that the Corps recognized +20 LWRP as the critical dividing line for placement in the river. Nelson also resequenced its work and moved to the chute on 14 October 2009 at the Corps' direction due to high water stages (above + 20 LWRP) in the river. The Corps conceded that appellant was entitled to time extensions for four days from 19 thru 22 October 2019 when the river stages ranged from 20.4 to 22.8 LWRP. However, it inexplicably failed to consider or grant time extensions for the overwhelming majority of days between 13 October 2009 through the date of termination on 5 February 2010 when the river stages ranged above 22.8 LWRP into the mid to upper 30s for most of that period. On only 26 days during that approximately 108-day period did river stages sporadically drop below 20.4 and it was not until 30 November 2009 that the stages were consistently below 20.4 for more than a four-day stretch. The only period where the river was significantly below the +20 LWRP yardstick was 1 October through 12 October 2009 while appellant was mobilizing and awaiting direction from the Corps regarding the "hump" issue. Notably, water levels during that period were also too low to float its plant/equipment into the chute even if Nelson had elected to commence work there first.

The government asserts that appellant never timely broached the issue until the early November exchanges of correspondence. At best, even if Nelson had raised the issue, it would have received the same answer from the government premised on its unreasonable interpretation. Moreover, given the short duration of performance of this contract, we do not consider that the issue was untimely raised.

B. The "Hump"

Determination of a precise revised completion date for the Loosahatchie and Robinson Crusoe work is difficult at best and not essential to resolving the propriety of the termination. There has been no attempt by the government to address the daily river stage data and the "hump" issue that was never resolved due to the failure of government's "scour solution" through the date of termination. No matter how diligently appellant prosecuted the work, it could not complete the Loosahatchie dike extension as matters stood through the time of termination.

In addition, as awarded the specifications and drawings were deficient in the sense that the "hump" within the design template made it impossible to execute the stone placement plan. The specification's methodology for orderly, "continuous," "steady and uninterrupted" placing of stone in lifts from the land to the river could not be achieved. We agree with the Corps that some adjustments to structure designs based on current sedimentation conditions were contemplated. In addition, it may be as the Corps asserts, that the "hump" issue might have been resolved relatively easily. Nevertheless, appellant's work on the dike was disrupted and delayed until the drawings were finally redesigned and a "solution" for the "hump" provided.

29

The Corps knew about the defects as of 22 September 2009 but issued the NTP without first resolving them. No effective Corps solution was provided to appellant until 13 October 2009, 12 days following issuance of the NTP for a site with a 20-day performance period. Regardless of any concurrent delays attributable to Nelson in mobilizing and setting up equipment, the government concurrently caused the delay in commencing work through 13 October 2009. Appellant did not have all needed information to fully plan and prosecute its work. Until the final and corrected version of the drawings were received by Nelson on 13 October 2009, appellant was not apprised as to how the government intended to solve the "hump" issue in the channel.

The Corps also does not dispute that low water stages prevented work in the chute during the period 2 October 2009 through 13 October 2009. Thus as of 13 October 2009, appellant could not work on any of the structures at the Loosahatchie site whether in the channel or the chute. Despite this *de facto* lack of working access, the Corps notified Nelson on 13 October 2009 of its unsatisfactory progress in prosecuting the work.

For unclear reasons, Nelson executed Mod. 4 without reservation of rights regarding a time extension. Absent the ostensible release of rights, appellant was unquestionably entitled to a time extension as a result of the "hump," resultant design revisions and inability to work in either the chute or the channel. Because the modification was ambiguous and incomplete and because work in the channel in compliance with the specifications was unfeasible until a redesign was finalized in the version of Drawing 9D given to appellant on 13 October 2009, we consider that the modification did not foreclose a time extension.[5] First, there were two versions of the drawing. The first version of 7 October failed to set forth the "scour solution," while the 13 October version incorporated that solution. The Corps did not assign an "E" designation to the latter version despite the revision. Mod. 4 did not specify which version of the drawing was covered. Moreover, the effective date of Mod. 4 was 9 October 2009. On that date, the only extant version of the drawing known to Nelson was the emailed 7 October 2009 revision without the "scour solution." Not only is the modification ambiguous as to which version of Drawing 9D it expressly referenced, it was incomplete in not identifying and modifying critical specification procedures governing stone placement on the dike extension. The note simply stated that Nelson was to allow the river to scour areas above elevation 154.9' "prior to stone placement." Reasonably construed, appellant was not permitted to place stone prior to scour. At best, the "scour solution" was incompletely and ambiguously implemented regardless of what

---

[5] We also note that the government briefs do not discuss the consequences of appellant's execution of the modification. Instead, the Corps simply contends that, since no change in the stone quantity resulted from the revised drawings, Nelson was not entitled to an equitable adjustment. This specious argument does not address appellant's more basic contention that it could not work on the Loosahatchie dike extension until the drawings were revised and the "scour solution" provided.

30

the Corps intended. The drawing revision and modification do not clearly address how Nelson was to commence performance in the channel or comply with the numerous contractual stone placement restrictions and procedures without a comprehensive final redesign and a solution for the "hump." Steady, continuous, sequential construction for the length of the extension from the land to the river was not possible absent that proof. In light of these ambiguities, we do not consider that appellant released possible rights to a time extension.

Nor has the Corps shown how appellant was to ultimately complete the Loosahatchie dike extension when the river failed to timely "scour." The government fails to establish as part of its burden of proof that placement of rock in the river in accordance with the specifications was possible given the continuing presence of the "hump." Nelson could not perform in accordance with the unmodified specifications, much less complete the structure. The "hump" (as well as the high river stages) made that impossible. Again, Nelson was deprived of effective and full working access to the entire site.

### C. The SWO and Corrective Work

The Corps emphasizes Nelson's failure to complete corrective work between the SWO issuance on 6 November 2009 and the termination. Of course, the SWO, as a minimum, precluded further new work. That SWO was never lifted effectively even with respect to so called "corrective work." On the one hand, the government contends that appellant never corrected its work. On the other, the government insists that appellant's plans for correcting the work were deficient and not approvable.

There are several problems with the Corps contentions regarding this work. First, the broader issue for decision in these appeals is whether the termination for default was proper. We have fully considered Nelson's noncompliant work and the extent of corrective work in reaching our decision. All factors considered the termination was not sufficiently justified for reasons noted herein.

In addition, the government issued its "show cause" letter on the same date it issued the SWO of 9 November 2009. Thereafter, the evidence warrants the conclusion that the broader focus of the discussions between the parties had shifted as a practical matter to whether Nelson should be terminated. As viewed by the government, the scope of "correction" of defective work involved more than simply addressing the narrow issue of out-of-section or improperly placed stone. It more broadly encompassed all issues associated with perceived inadequacies with appellant's quality control procedures and lack of capability generally, i.e., the same issues that drove the termination decision. In fact, the government argues that Nelson's responses to the government's requests failed to consider how it would address potential issues with the performance of the Cow Island and Friars Point sites for which NTPs had yet to be issued. Under these circumstances and given the broad scope of the government's requirements for "approval" of appellant's

31

plans, it is disingenuous for the government to emphasize alleged delays in simply correcting the noncompliant placement of stone.

Also, the SWO itself required "approval of the corrective action" plan and there was never any written CO approval that could be viewed as unambiguously authorizing corrective work. The SWO was never clearly and effectively lifted even for the performance of corrective work. At best, the extent of any oblique oral government authorization of corrective action by a second CO at the 2 December 2009 meeting was short-lived. It was superseded nine days later by CO Sweeney's letter of 11 December 2009. To the extent that the Corps may have authorized some correction, remedial work generally could not permissibly, much less efficiently, be performed given prevalent adverse stage conditions through the date of termination.

We also do not consider that the government's rejection of appellant's offers to bring additional and more experienced subcontractors and mobilize additional equipment and crews was reasonable. A considerable portion of the time that the government claims was available for corrective work paralleled sporadic, unresolved discussions over the "show cause" proposals and ancillary corrective action plans. The evidence supports the conclusion that the government did not fairly, objectively and timely evaluate Nelson's offers. It failed to respond substantively in writing until formally rejecting appellant's offers on 8 January 2010. Because the broader context of the post-SWO discussions was whether to terminate, it is understandable that appellant did not fully augment its workforce pending definitive guidance and resolution of that issue.

Finally, there is no reliable estimate of how long the corrective work would have required. Given the minor overall amount of stone placed on the Loosahatchie dike and chevron, the record does not justify a conclusion that considerable time would have been required to correct the noncompliant work if Nelson's proposals to hire additional crews and equipment had been approved and the SWO lifted.

D. Equipment and Quality Control Issues

The government emphasizes the extensive quality control and equipment problems appellant experienced. We have fully and carefully considered this evidence even if not exhaustively detailing it in our findings. However, given all factors in this case, appellant's problems were insufficient to justify the termination. Evidence of "equipment issues" were often concurrent with periods when Nelson could not work because of river/chute conditions or was awaiting final revised drawings 9D and 10D from the Corps through 13 October 2009. To a degree, such issues also reflect normal downtime and/or early-learning curve, set-up and initial operating issues with the equipment that have not been shown to be unusual in our view. In addition, the fact that appellant was able to place the Roundpoints expeditiously and in compliance with contractual requirements provides some evidence of its competence. As noted above, the Corps unreasonably ignored or discounted appellant's promises to augment its equipment and crews in several

32

meetings and exchanges between the parties. All factors considered, the termination decision was imprudent and not justified.

We also note that the construction Default clause (unlike the corresponding supply/service clauses) does not expressly authorize termination for material breach of other contract provisions, such as the quality control clauses. The pivotal issues focus on the actual non-compliances with the specifications and contract and their impact on the propriety of the termination not the adequacy or violations of Nelson's quality control manual *per se*.

E. Estimated Stone Placement Rate

The Corps relies heavily on estimation of a daily placement rates for the stone to assess whether appellant could have completed on time. The estimated rates are highly problematic. The placement of stone in a "steady and uninterrupted manner," so as to ensure "continuous progress" once construction of a dike or chevron "has been started" in accordance with the "CONSTRUCTION PROCEDURES" section of the specifications was not possible in the river, if not in the chute, for the vast majority of the contract period as detailed above. The "hump" exacerbated the problem of orderly placing stone in compliance with the specifications. The SWO on 6 November 2009, effectively further precluded a more judicious assessment of Nelson's ability to timely complete if river conditions improved. There are also factual issues concerning the precise amount of stone placed by Nelson that we do not consider it necessary to address because of the general unreliability of the government's estimated rates for more basic reasons.

We also do not consider that the amount of stone placement work performed constituted a sufficient "sample size" to prudently evaluate appellant's progress or production rate for Loosahatchie and Robinson Crusoe, much less the total potential work at all sites. This is particularly true in view of the evident, extensive confusion regarding the meaning of the specifications and compliance therewith to the extent they were clear regarding placement limitations and procedures, as well as other considerations discussed above. Nor do such estimates serve as a sound basis for imposing the drastic sanction of termination.

Furthermore, once appellant mobilized to begin the Loosahatchie dike extension first, it was forced to move to less adverse conditions in the chute as a consequence of the unfavorable stages in the channel. This move to the chute evidences not only that the work was resequenced by Nelson but also that it did not have complete working access to the Loosahatchie and Robinson Crusoe site, including the river location of the majority of the work. It also indicates that appellant lost time resequencing its work in moving from the river to the chute.

The river stages, resequencing, the "hump," normal "learning," and lack of working access, make it particularly difficult to develop a reliable estimated rate for placement of the remaining stone. The stone placement rate also assumes that appellant would not supplement its on-site equipment with additional equipment, more experienced crews and/or subcontract portions of the work once river conditions permitted sustained work on the dikes. The Corps never timely responded to Nelson's proposals to augment its crews and equipment until they were rejected for all practical purposes on 8 January 2010.

Nelson was also unfairly pressured by the government to perform the work because of perceived lack of progress at these sites despite the presence of excusable causes of delay, including high river stages in the channel and frequently low river conditions in the chute. For example, on 13 October 2009, the Corps expressed concerns about lack of progress at Loosahatchie even though the Corps had not developed a solution to the "hump" issue and finalized the necessary drawing revisions and even though water levels in the chute were too low to permit work on that portion of the site. Nelson placed considerable stone in adverse river stage conditions in response to the Corps directions to expedite progress.

## CONCLUSION

We conclude that the termination for default of the captioned contract was improper.[6] Accordingly, ASBCA No. 57201 is sustained. ASBCA No. 58166 is dismissed as premature without prejudice to appellant's right to submit a timely termination for convenience settlement proposal to the contracting officer.

Dated: 15 December 2015

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[6] Because we sustain the appeal for the reasons stated, we do not reach appellant's allegations regarding government "bad faith" and racial bias in administering and terminating the contract. Nor need we address Nelson's other contentions challenging the propriety of the termination, including facts and inferences to be drawn regarding the reprocurement contract.

34

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

ELIZABETH A. TUNKS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur
(see separate opinion)

TERRENCE S. HARTMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I concur in part and dissent in part
(see separate opinion)

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN CONCURRING

I write separately only to state that I deem discussion in our majority opinion of "severance" of the parties' contract into parts simply to be "dicta." Our holding that the default termination here was improper does not require us to address the issue of contract "severance."

In this appeal, the Corps terminated for default Nelson's "165-day" contract to build various underwater stone structures by dropping stone from specially equipped vessels into the Mississippi River. It argued at trial that its termination was "proper" because Nelson failed to "deliver" the Loosahatchie-area work (consisting primarily of a dike extension and chevron) within 20 days. As our majority opinion ably notes, for a number of reasons, the Corps did not satisfy its burden of proving the existence of a "default." Those reasons included that there was a contract "specification" requiring the dike extension be built in layers from the start of the extension to completion point, which the Corps did not waive even though the specification could not be adhered to by any contractor due to existence of a "sediment hump" in the extension's path. In sum, the dike extension work the Corps utilized as its basis for terminating Nelson's entire "165-day" contract was never completed, but deleted from the Corps' re-procurement contract because the sediment hump barring Nelson's work completion never scoured, remaining in the path of the dike extension.

Neither the Corps nor Nelson argued in this appeal that the parties' "165-day" contract should be severed into various parts. Thus, no testimony or other evidence was directly presented by the parties regarding their intent to allow or not allow severance of the contract into pieces. Severance of the parties' 165-day contract into parts was raised *sua sponte* (without any briefing) by the dissent in an attempt to sustain Corps termination of Nelson's contract, in whole or in part, for "default."

Also, the Corps never argued at trial that it could have terminated Nelson's contract for default based upon a "failure to make progress" by Nelson with respect to the 165-day contract and, therefore, did not present evidence showing its CO was justifiably insecure that the entire (or some part of the) contract could not be timely completed. A "failure to make progress" on the parties' contract was raised by the dissent *sua sponte* (without briefing) in an attempt to sustain the Corps' default termination.

Because the Corps did not find a remedy for the large sediment hump in the path of the Loosahatchie dike extension precluding Nelson's completion of the dike extension due to no fault of Nelson's, it simply was not possible for Nelson (or any contractor) to complete "all" specified contract work within the 165 days set forth in the contract. *See Dynalectron Corp. (Pacific Div.) v. United States*, 518 F.2d 594 (Ct. Cl. 1975) (defective drawings or specifications precluding completion of the contract

36

work by scheduled dates are a bar to default termination); *DCX, Inc.*, ASBCA Nos. 37669, 37670, 92-3 BCA ¶ 25,125. We therefore need not engage in an analysis of whether the Corps CO could reasonably have believed on the date of default termination (months after CO issuance of a stop all work order) that there was no reasonable likelihood that Nelson could timely complete all contract work. The CO had been advised by Nelson that the sediment hump had grown larger (instead of scouring as the Corps hoped) and thus the CO knew that no contractor could complete the Loosahatchie dike extension, as currently specified, on date of default termination.

Moreover – whether the parties' contract is severable or not – the record in this appeal does not show the CO could reasonably have believed there was "no reasonable likelihood" Nelson could have performed the entire effort within the time remaining if the Corps altered the specification precluding dike extension completion or otherwise resolved the issue of the large sediment hump. The Corps acknowledged here that there was a "learning curve" with respect to dropping stone into a fast flowing river to extend an existing stone dike in layers. There is no testimony in the record, however, discussing or analyzing the "learning curve" that would allow us to conclude (after only about two weeks of work by Nelson on the contract) that Nelson could not timely complete the remaining work in the 21 or more weeks provided for completion of that work. *See, e.g., Haselrig Constr. Co.*, PSBCA No. 4148, 00-1 BCA ¶ 30,674 (even if contractor was behind schedule, it still could have accelerated its performance and timely completed the work, especially in view of government failure to cooperate in resolving latent subsurface design problem); *Kleen-Rite Corp.*, ASBCA No. 23690, 79-2 BCA ¶ 14,024 at 68,899 (Board may base decision on theory different than parties only if necessary facts are adequately developed in record).

Our precedent requires that, in analyzing a default based on a failure to make progress, we determine whether the CO could reasonably believe the rate of contract progress will not insure work completion within the period specified in "the contract." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016-17 (Fed. Cir. 2003); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765-66 (Fed. Cir. 1987). Neither party to this appeal asserts otherwise. While this Board has on rare occasion "severed" a contract *sua sponte* into parts after establishment of a "default," to the best of my knowledge, we took such action to avoid the drastic sanction of a "total" forfeiture when a problem existed only with respect to a severable part of the contract. *E.g., R.E. Lee Electric Co.*, ASBCA Nos. 6195, 6447, 61-1 BCA ¶ 3002; *accord Murphy v. United States*, 164 Ct. Cl. 332, 341 (1964); *Spartan Aircraft Co. v. United States*, 120 Ct. Cl. 327, 345-47 (1951). The Board's *sua sponte* severance here is not taken based upon a specific assertion of partial default or after the establishment of a "default" to avoid a contractor "forfeiture in total" but potentially to sustain a "forfeiture" (on a theory advanced by the Board). While we hold ultimately there is no default on any severed contract "part" and thus no "forfeiture" by Nelson, if the dicta in our majority opinion "severing" the contract is construed as allowing a CO or Board judge to *sua sponte* sever a contract into parts to analyze if a CO could reasonably

37

believe that a contractor's rate of progress does not insure the completion of one or more work parts within "the time a CO or we set" for completion of the severed parts of work, we could be viewed as authorizing a deviation from the well-established review standard for an asserted failure to make progress. There is no reason for us to depart from that standard here, and statements made by us should not be construed as an authorization for doing so.

In sum, the Corps failed to satisfy its burden of proving the default it asserted – failure to timely complete the Loosahatchie work – and there is no reason for us to *sua sponte* sever the parties' 165-day contract into parts in an attempt to possibly conclude some default existed and thereby sustain a contractor forfeiture in whole or in part. *See Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004) (delivery of first aircraft was interim milestone, not ultimate performance requirement); RICHARD J. BEDNAR, HERMAN M. BRAUDE, JOHN CIBINIC, JR., GILBERT J. GINSBURG, J. RICHARD MARGULIES, RALPH C. NASH, JR., DOUGLAS L. PATIN, & ANDREW W. STEPHENSON, CONSTRUCTION CONTRACTING 837-843 (1991) (all defaults (irrespective of magnitude of failure) will *not* allow a party to unilaterally terminate a contract).

TERRENCE S. HARTMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

38

## OPINION BY ADMINISTRATIVE JUDGE MCILMAIL CONCURRING IN PART AND DISSENTING IN PART

With respect to ASBCA No. 57201, I concur in part, and respectfully dissent in part. I agree that the contract is separable, and that the government should not have terminated the Friars Point work and the Cow Island work for default. The government never issued notices to proceed with the Friars Point work or the Cow Island work; therefore, those parts were not delayed. Accordingly, I concur with converting the termination of the Friars Point work and the Cow Island work to a termination for the convenience of the government.

However, I would deny the appeal with respect to the Loosahatchie work and the Robinson Crusoe work. First, I disagree that the Loosahatchie work and the Robinson Crusoe work are not separable from each other. Each was subject to its own notice to proceed and its own completion date. Each was priced separately, and could have been awarded and performed, not only separately (indeed they were performed separately, in that performance of neither depended upon performance of the other), but sequentially. That the Loosahatchie site and the Robinson Crusoe sites were closer to each other than they were to the Friars Point work and the Cow Island work changes none of that, nor does the inclusion of the Loosahatchie Dike No. 4 profile and the Robinson Crusoe Dike No. 3 profile (two entirely separate drawings) on the same page (app. supp. R4, tab 141 at 3360). Finally, upon the issuance (at Nelson's request) of the notice to proceed with the Robinson Crusoe work, the Loosahatchie work and the Robinson Crusoe work were performed and administered more or less concurrently, but that does not mean that they became one, inseparable "part of the work."

Second, when the contracting officer terminated the contract for default on 9 February 2010, it was reasonable to conclude that Nelson would be unable to complete the Loosahatchie work and Robinson Crusoe work on time. Here I disagree that the Loosahatchie performance period and the Robinson Crusoe performance period ever combined: Nelson had 20 days from receipt of the Loosahatchie notice to proceed to complete the Loosahatchie work (that is, until 21 October 2009), and 20 days from receipt of the Robinson Crusoe notice to proceed to complete the Robinson Crusoe work (that is, until 4 November 2009). The government delayed Nelson's Loosahatchie work from 2-13 October 2009 by the issuance of the final Drawing 9D not until 13 October 2009, and Nelson did not receive the Robinson Crusoe notice to proceed until 15 October 2009. Nelson performed or could have performed Loosahatchie work on at least 15 days between 13 October 2009 and 5 November 2009 (14-18 October 2009, 25-29 October 2009, and 31 October 2009 through 4 November 2009), and performed or could have performed Robinson Crusoe work on at least 13 days between 15 October 2009 and 5 November 2009

(16-18 October 2009, 25-29 October 2009, and 31 October 2009 through 4 November 2009).[7] Therefore, when the Corps stopped work on 5 November 2009, Nelson had no more than 5 days left to complete the Loosahatchie work, and no more than 7 days left to complete the Robinson Crusoe work.

By 5 November 2009, when the Corps stopped work, Nelson had placed 14,581 tons of stone, at an average daily rate of 1,041.5 tons per day, all for the Loosahatchie work, leaving no more than 5 days to place the other 17,669 tons of the contract-estimated 32,250 tons of stone required for that work, and no more than 7 days left to complete the 27,400 tons of stone estimated for the Robinson Crusoe work. (In other words, assuming the Loosahatchie work and the Robinson Crusoe work consisted entirely of placing stone (that is, no mobilization, survey, or notch excavation), Nelson had accomplished no more than 45% of the Loosahatchie work (14,581 of 32,350 tons) with at least 75% of the contract time having elapsed (15 of 20 days) and none of the Robinson Crusoe work (zero of 27,400 tons) with at least 65% of the contract time having elapsed (7 of 20 days). To place 17,669 tons of Loosahatchie stone in 5 days, Nelson would have to have placed an average of 3,533.8 tons per day, well more than its average daily rate of only 1,041.5 tons, and more than its highest daily rate of 2,535 tons. To place 27,400 tons of Robinson Crusoe stone in 7 days, Nelson would have to have placed an average of 3,914 tons per day, also more than its average daily rate. Viewed differently, at its average daily rate of 1,041.5 tons of stone per day, Nelson would have needed at least 17 more days to complete the Loosahatchie work, and at least 26 more days to complete the Robinson Crusoe work. Even at its highest daily rate of 2,535 tons of stone per day, Nelson would have needed at least 7 more days to complete the Loosahatchie work, and at least 11 more days to complete the Robinson Crusoe work.

Even viewed from the perspective of an "extended completion date," it was reasonable to conclude on 9 February 2010, that Nelson would be unable to complete the Loosahatchie and Robinson Crusoe work on time. If the contracting officer had lifted the stop work order in its entirety on 9 February 2010, and assuming that Nelson had already mobilized to the work sites, Nelson would have had only until 14 February 2010 (5 days after 9 February 2010) to complete the Loosahatchie work and only until 16 February 2010 (7 days) to complete the Robinson Crusoe work, but would have

---

[7] This accepts (1) the Corps' concession that 19-22 October 2009 were excusable delay days (gov't br. at 32); (2) as Nelson contends (app. br. at appended table), water levels precluded Nelson from working on 23-24 October 2009, during which, water levels aside, Nelson experienced problems with its equipment; and (3) Nelson's determination that weather prevented it from working on 30 October 2009. The Robinson Crusoe calculation does not count mobilization to the chute on 14 October 2009, because Nelson received the notice to proceed with the Robinson Crusoe work on 15 October 2009, the next day.

needed at least through 16 February 2010 (7 days after 9 February 2010) and most likely through 26 February 2009 (17 days), to complete the Loosahatchie work, and at least through 20 February 2010 (11 days after 9 February 2010) and most likely 7 March 2010 (26 days), to complete the Robinson Crusoe work. For all these reasons, it was reasonable to conclude on 9 February 2010, that Nelson would be unable to complete Loosahatchie or Robinson Crusoe work on time. *Cf. Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1357-58 (Fed. Cir. 2004) (affirming denial of appeal from termination of contract for default for failure to make progress where contractor was 154 days from contract completion with only 106 days to complete on time). Accordingly, the government's termination of the Loosahatchie work and the Robinson Crusoe work was justified.

Nelson contends that (1) 20 days were not enough to complete either the Loosahatchie work or the Robinson Crusoe work, (2) the follow-on contractor took 178 days to complete both the Loosahatchie and Robinson Crusoe work, (3) and that the hump at Loosahatchie Dike No. 4 "never scoured out," so that "no days should have been charged to Loosahatchie while the dike had to scour" (app. reply br. at 23). None of those excuses Nelson's lack of progress. With respect to the first two, on 8 December 2009, Nelson told the Corps that it planned to place 4,800 tons of stone per day. That statement means that at that rate, it would have taken Nelson only 6 days to place the 27,400 tons of stone for the Robinson Crusoe work, and only 7 days to place the 32,250 tons of stone for the Loosahatchie work, which means that the Loosahatchie work and the Robinson Crusoe work could have been performed within the 20 days allotted in the contract for each of those items of work. As for the hump, the issue is not whether had it continued to perform, Nelson would have been entitled to a time extension to wait for the hump to scour, or to a contract change to address the lack of scour, but whether on 9 February 2010, it was reasonable to conclude that Nelson, given its progress, would be unable to complete the Loosahatchie work and the Robinson Crusoe work within the days remaining in their respective contract completion periods even if there had never been any hump.

Citing *Technocratica*, ASBCA No. 44134 *et al.*, 94-2 BCA ¶ 26,606, Nelson contends that "the [contracting officer], prior to termination, should have analyzed progress problems against a specified completion date and adjusted to account for any Corps-caused delays" (app. reply br. at 22). In converting a default termination to one for convenience in *Technocratica*, the Board stated that "[t]he Government must analyze progress problems against a specified completion date," and that "[w]e have nothing of record in writing...to support the Government's contention that appellant's performance or progress was considered against any specific 'extended' completion date." 94-2 BCA ¶ 26,606 at 132,370. However, the United States Court of Appeals for the Federal Circuit has explained that our inquiry is an objective one, requiring us to consider whether the contracting officer's decision to terminate for failure to make progress was reasonable given the events that occurred before the termination decision was made. *Empire Energy*, 362 F.3d at 1357-58. The ultimate question is whether it

41

was reasonable to conclude that the contractor would be unable to complete the work on time. *See id.* at 1357. Reviewing *de novo* the totality of the circumstances, *see AEON Group, LLC*, ASBCA Nos. 56142, 56251, 14-1 BCA ¶ 35,692 at 174,760, when the contracting officer terminated the contract for default on 9 February 2010, it was reasonable to conclude that Nelson would be unable to complete the Loosahatchie work and the Robinson Crusoe work on time.

With respect to ASBCA No. 58166, I respectfully dissent, and would simply set a schedule for further proceedings.

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57201, 58166, Appeals of Nelson, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

42